**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CLOVER FAST FOOD, INC. | ) | Case No. 23-11812 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**OMNIBUS DECLARATION OF JULIA WRIN PIPER**
**IN SUPPORT OF FIRST DAY MOTIONS AND CHAPTER 11 CASE**

I, Julia Wrin Piper, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer ("CEO") of Clover Fast Food, Inc. ("Clover" or the "Debtor") and submit this omnibus declaration (the "Declaration") in support of the first day motions filed in the above-captioned Chapter 11 case (the "Bankruptcy Case") and the Bankruptcy Case.  I am familiar with the Debtor's operations, day-to-day business, affairs, and books and records.

2.      I submit this Declaration in support of the Bankruptcy Case and the relief sought in the various first day motions filed contemporaneously with this Declaration or shortly thereafter. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussion with the directors, officers, and other employees of the Debtor, my review of relevant documents or my opinion, based on my experience, and knowledge of the Debtor's operations and financial condition. In making this declaration, I have relied, in part, on information and materials gathered, prepared, and provided to me from the Debtor and the Debtor's employees kept in the ordinary course of the Debtor's operations.

3.      On November 3, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing the

Bankruptcy Case.  The Bankruptcy Case is pending as a Subchapter V, Chapter 11 case and, as such, no committee or examiner has been appointed in the Bankruptcy Case.

I.      **History and Background of Clover Fast Food Inc.**

4.      Clover is a mission-based company with the goal of addressing climate change through the transformation of the American food system by making vegetable-based fast food and home cooking the most desirable of all diets. Our aim is always to win on flavor, not the logic of climate science. We source our vegetables, grains, and as many other ingredients as possible locally to ensure consistent quality and freshness. Our offerings rotate frequently to feature the most in-season vegetables as possible. We provide food through our brick-and-mortar locations, our home-delivery meal box service, and catering.

5.      Currently, 85-90% of Clover's customers are not vegetarian (based on monthly in-store surveys), meaning that each meal Clover serves or delivers has a direct impact on reducing global warming. Vegetable-based meals can have as much as one twentieth (1/20) the greenhouse gas impact versus a normal meat-containing meal. Clover aims not to convert our customers to vegetarianism or veganism, but to make food so delicious that the average American will choose our fare over meat-based meals.

6.      Clover has a vast library of over 1,500 tested recipes, which allows the company to pivot its menu offerings quickly based on farm pricing and the success (or failure) of certain crops. In its marketing, Clover emphasizes that its food "follows the seasons" and relies on sourcing from local farms. Murals in Clover locations proclaim, "The best food is made by your neighbors!", "Ask us what's in season today," and similar slogans. Clover's relationships with over 20 regional farms and a vast number of small-scale artisanal producers (coffee roasters, tofu makers, pasta producers, tortilla experts) are a bedrock of the brand.

7.      Clover started in 2008 when its founder Ayr Muir, an MIT-trained engineer and Harvard Business School graduate, parked a food truck in Cambridge, Massachusetts with the mission of figuring out how to create vegetable-based meals that meat lovers would preferentially purchase. The Clover food truck was a quick success with lines around the block and attention from the press.  In 2009, Clover was approached by the Greenway, an organization in Boston that operated the land impacted by the "Big Dig" construction project. The Greenway asked Clover to open a second food truck on its property in a prominent area near South Station called Dewey Square.

8.      The food truck Clover operated at Dewey Square was the first food truck in the City of Boston in more than 20 years.  The success of the Clover food trucks led to an expansion into brick-and-mortar restaurants. Clover's first restaurant was in Harvard Square in 2011 and it soon found a large and dedicated customer base. Clover expanded to additional restaurants in Cambridge and Boston with a focus on serving students and office employees in dense urban areas.

9.      The restaurants are supported by a commissary model. Clover signed a lease for a 20,000 square foot space in East Cambridge that serviced the restaurants and the food trucks, which at their peak numbered 10 trucks, rotating across 8 sites.  In 2016, Clover transitioned away from daily truck operations to focus on the more profitable restaurants, currently retaining two (2) food trucks for use at marketing events and catering.

10.     Alongside its food business, Clover has developed an in-house, proprietary point-of-sale and kitchen display technology. Clover customers use a single, stream-lined digital platform to purchase from restaurants, set-up and manage meal box subscriptions, purchase and meal boxes and pantry items, and sign-up for community-supported farm shares. The technology also supports the frequent updates to Clover's digital menus, which are constantly changing based on inventory and availability of new vegetables from the company's network of local farmers.

-3-

11.     Clover has received local and national press coverage and accolades for its fresh, healthy, and innovative food offerings, including "Restauranteur of the Year" from the Massachusetts Restaurant Association in 2018 and Boston Magazine's "Best in Boston" Local Lunch Chain in 2022. Our meal box delivery service has also been featured extensively in local press coverage, most recently by Boston Magazine in April 2023, which said "the locally sourced boxes promise to transform even the staunchest meat eater into a veggie aficionado." Our catering offering has been seeing a recovery as well, and Clover has been chosen as a preferred caterer by MIT.

## II.    Events Leading to Bankruptcy Case

12.     Clover was experiencing rapid growth pre-COVID and scale-driven improvements to company economics. In 2019, according to accounting practices at the time, the average unit volume of Clover's mature restaurants approached $1,700,000, a strong performance for fast casual restaurants, and an 18% 4-wall EBITDA. The pandemic had an immediate and lasting impact on Clover's business, as it did on all restaurants.

13.     During the pandemic, Clover received support from government programs designed to protect businesses, including the employee retention tax credit. Clover also saw support from long-term investors in the form of convertible debt financing.  Clover quickly pivoted in the pandemic, like many companies, and created a new business line in 2020 by selling daily meal boxes to people locked down in their homes. These meal boxes, which were created out of Clover's need to adapt to pandemic consumer market changes, has become a profitable business that contributes approximately 20% of Clover's annual revenue and has further potential for growth.

14.     As the world emerged from the pandemic, in 2022 and 2023, Clover saw improved traffic and sales in its restaurants, and projected a full return to pre-pandemic sales volume by

274290561

2024.  However, as we approach the end of 2023, restaurant traffic remains lower than pre-pandemic levels at brick-and-mortar locations, and all rental abatements and government assistance have ceased.  These dueling strains on liquidity have played out as Clover and its board of directors were looking to expand.  At the beginning of 2023, in hopeful anticipation of a strong emergence from the pandemic, Clover's board and investors expected to raise growth equity to expand the company's footprint around New England and into New York City.  Based on this plan, Clover signed a lease and started construction on a 2.5x larger commissary located at 50 Industrial Drive in Boston ("IND").

15.    Unfortunately, Clover's expansion plans and equity raise coincided with the failure of Silicon Valley Bank and the subsequent slowing of growth equity financial markets. Despite fundraising efforts on behalf of Clover's Board and Ayr Muir (CEO at the time), the funding plan was unsuccessful. Clover's expansion-related costs remained intact, however, and the company was still liable for the long-term lease at IND.  In May 2023, Clover received a term sheet for new capital that would raise enough funds to support eighteen (18) months of non-expansion operations.  The plan was to operate current restaurant locations and company verticals, consistently growing sales and reducing costs, until revenue was sufficient to cover the on-going elevated expenses of the costly IND commissary and the few remaining struggling brick-and-mortar restaurants.

16.    The first tranche of this funding was closed in May 2023 bringing in $1,800,000. In June, Clover also took a number of steps to try to conserve cash, including a 43% reduction in combined salary and hourly spend on corporate wages. The second tranche was expected to close in August 2023, but this did not come to fruition.  In reaction to this set of events, Clover has set a focus on pursuing corporate profitability as quickly as possible. There are a few structural obstacles to this, specifically the lease for IND, and three (3) restaurants that have high rent and

low sales. Clover attempted to work with these landlords on solutions that would set the company up for profitable operations.  Regrettably, these negotiations did not progress rapidly enough to create long-term viability, which has led Clover to pursue relief as a small business debtor under Subchapter V of Chapter 11 of the Bankruptcy Code (11 U.S.C. § 101, *et seq.*)

## II.    Organizational Structure, Leases, and Operations

17.    Clover currently operates 12 restaurants, 2 kiosks within area Whole Foods, a catering business, and meal box production and delivery seven days per week to customers in and around Boston.  All of these business lines, including each restaurant, are owned and operated through Clover, a C-corporation.  Ayr Muir, Clover's founder, remains a shareholder and member of the board of directors.  Ayr agreed to transition out of his role as Chief Executive Officer ("CEO") of Clover prior to the bankruptcy filing but remains as an advisor during this process.  I assumed the role of CEO shortly before filing and, prior to becoming CEO, including a brief hiatus from the company, I served as Chief Operating Officer of Clover for eighteen (18) months.

18.    Clover also has a Chief Marketing Officer, a Senior Vice President of Food Systems and Wholesale, and a Director of Finance, who is supported by two full-time employees in the finance department.   In total, Clover has 35 full-time employees on the corporate support/leadership team across the company, and 53 full-time hourly employees in the restaurants, commissary, and logistics.  Most of Clover's employees are employed part-time and, at current capacity, Clover employs nearly 185 part-time employees in the restaurants, commissary, and as drivers.

19.    The twelve "Restaurants" are at the following locations throughout Boston, Cambridge, and the surrounding neighborhoods:

      a.      "BUR" – Clover Burlington: 18 Burlington Mall Road (Burlington)

      b.      "DTX" – Clover Downtown Crossing: 27 School Street (Boston)

    c.      "FIN" – Clover Financial District: 160 Federal Street (Boston)

    d.      "HFI" – Clover HFI/Central Square: 496 Massachusetts Avenue (Cambridge)

    e.      "HSC" – Clover Harvard Science Center: 1 Oxford Street (Cambridge)

    f.      "HSQ" – Clover Harvard Square: 1326 Massachusetts Avenue (Cambridge)

    g.      "HUB" – Clover Hub/HQ in Inman Square: 1075 Cambridge Street (Cambridge)

    h.      "KND" – Clover Kendall Square: 5 Cambridge Center (Cambridge)

    i.      "LMA" – Clover Longwood Medical Area: 360 Longwood Avenue (Boston)

    j.      "NTV" – Clover Newtonville: 835 Washington Street (Newton)

    k.      "PRU" – Clover in the Prudential Center: 800 Boylston Street #15 (Boston)

    l.      "ROW" – Clover at Assembly Row: 330 Foley Street (Somerville)

20.    Clover does not own any of the real property on which the Restaurants are operated and each Restaurant is subject to an unexpired, long-term lease with a third-party landlord.  From a fiscal operating standpoint, the Restaurants today show a promising picture of post-pandemic recovery. However, from conversations with industry experts and customer anecdotes, we understand that the significantly slower recovery in sales in a few locations to be primarily attributable to more of the urban workforce working remotely in some capacity. All leases outside of NTV, PRU, and ROW were committed to before the pandemic, with different assumptions about in-person consumer behavior. The Debtor, in conjunction with its professionals, intends to undertake an extensive examination of its current and future rental obligations to ensure long-term stability and profitability for the Debtor.  There has already been some success here, with HSQ agreeing to move to a percent-of-sales rent model.

21.     Likewise, prior to the Petition Date, the Debtor held a long-term lease for its BBY location at 565 Boylston Street in Boston, Massachusetts – commonly referred to as Clover Back Bay.  BBY had steady operations; however, following the Debtor's emergence from COVID-19, the steady operations could not sustain the increased rents underlying its location.  As such, as part of its initial review of operations, Clover ceased rental payments on BBY and the respective landlord evicted Clover from BBY in late-August 2023.  The landlord for DTX, located at 27 School Street in Boston, has similarly refused to renegotiate the burdensome lease for the location and the Debtor anticipates operations to cease at this location shortly after the Petition Date.

22.     In late 2021 and early 2022, Clover projected significant growth, which led the company to commit long-term to the significantly larger IND commissary.  The capital markets dried up as Clover was attempting to raise its new funding and was left with an expensive, overly burdensome, and unfinished commissary.  The IND lease commenced in February 2022 and had a 10-year term.  Its base rent started in 2022 at $53,933 per month and increased to over $70,000 per month in its final year.  Clover negotiated a lease termination with IND's landlord on the eve of bankruptcy that permitted the landlord to retain Clover's security deposit in exchange for access to remove all equipment, plus a waiver of all past due arrears (greater than $200,000) and any future rent claims in the bankruptcy estate (15% of the remaining future rent is approximately $1,015,050).

23.     The Debtor intends to utilize the Chapter 11 case to permanently stabilize its finances through its review of all future lease commitments and examine additional financial restructuring, whether through cost-cutting or operation efficiencies, to further enhance its long-term liquidity.

274290561

**IV.**    **Overview and Evidentiary Support for First Day Motions**

24.    Contemporaneously with the filing of this Declaration, the Debtor has filed or expects to file a number of First Day Motions seeking orders granting various forms of relief intended to preserve value as the Debtor seeks to stabilize its business, facilitate the efficient administration of this chapter 11 case, obtain authority to use cash collateral, lessen the impact of the chapter 11 case on the Debtor's day-to-day operations, and facilitate a successful chapter 11 Plan for the Debtor.

25.    I believe that this Court's approval of the relief requested in the First Day Motions is essential to avoid immediate and irreparable harm to the Debtor and its estate, to provide the Debtor with an opportunity to continue to meet its obligations in the ordinary course of business, to provide for a smooth transition into chapter 11, and to provide for the efficient and swift administration of this chapter 11 case. A description of the relief requested, and the facts supporting each of the First Day Pleadings, is set forth below.

**V.**    **First Day Motions**

26.    The Debtor filed the Bankruptcy Case in order to create the breathing room necessary to restructure its operational and financial affairs, review its lease commitments, and reinstate its pre-pandemic growth trajectory.  Through the Bankruptcy Case, the Debtor will reject leases for underperforming restaurants and above-market rental locations, sell underutilized delivery vehicles, and emphasize the Debtor's most profitable business lines.  The relief requested in the foregoing First Day Motions is tailored to ease the Debtor's entry into Chapter 11 and ensure its on-going operations through this process.

a.    <u>Application to Retain Claims and Noticing Agent</u>

27.    The Debtor has filed an *Application of the Debtor for Entry of an Order Pursuant to 28 U.S.C. 156(c), Bankruptcy Code Section 105(a) and Local Rule 2002-1(f), Authorizing*

*Appointment of Stretto, Inc. as Claims and Noticing Agent to the Debtor, Effective as of the Petition Date.* By this Application, the Debtor requests approval of the retention and employment of Stretto, Inc. as claims and noticing agent for the Debtor in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware. The Debtor anticipates that there will be a significant number of entities to be noticed in this case. It is my understanding that, in view of the number of anticipated claimants and significant vendors required for the Debtor's on-going operations, the appointment of the Claims and Noticing Agent is both necessary and in the best interests of the Debtor's estates and their creditors because the Debtor will be relieved of the burdens associated with Claims and Noticing Services.

    b.  <u>Motion to Redact Personally Identifiable Information</u>

  28.  The Debtor has filed the *Motion for Entry of Interim And Final Order Authorizing, but Not Directing, the Debtor to Redact Certain Personal Identification Information for Individual Creditors* (the "<u>PII Motion</u>").  Through the PII Motion, the Debtor seeks to redact personal mailing addresses of individual creditors from any paper filed or to be filed with this Court in the Chapter 11 Case, including the matrix summarizing (a) the name of each creditor, (b) the amount paid to each creditor on account of its Claim and (c) the goods or services provided by such creditor (the "<u>Creditor Matrix</u>"), certificates of service, and the Debtor's schedules of assets and liabilities and statement of financial affairs (collectively, the "<u>Schedules and Statements</u>").

  29.  A significant segment of the Debtor's creditors are the Debtor's current or former employees. Creditors may also include the Debtor's customers. The inclusion of such personally identifiable information of such individual creditors and interest holders may, among other things, (a) create an undue risk of identity theft contemplated by section 107(c), and (b) expose such individuals to other types of unlawful injury such as harassment or violence by abusive former partners or past perpetrators. Absent such relief, the Debtor would unnecessarily render individual

274290561

employees, suppliers, customers, or other creditors more susceptible to identity theft, harassment, and phishing attempts, jeopardize their safety.

30.     The risk of individuals is not merely speculative. In at least one chapter 11 case in this district, an abusive former partner of a debtor's employee exploited the publicly accessible creditor and employee information filed in a case to track that employee at her new address, which had not been publicly available until then, forcing the employee to change her address again for her safety. This incident is further described in the creditor matrix motion filed in *In re Charming Charlie Holdings, Inc*., Case No. 19-11534 (CSS) (Bankr. D. Del. Jul 11, 2019) [Docket No. 4].

31.     Given the hundreds of individual creditors and parties-in-interest in this Chapter 11 Case, including the Debtor's current and former employees, shareholders, and the Debtor's customers, the Debtor is unable to know with sufficient certainty whether disclosing such individual creditors' personally identifiable information could potentially jeopardize their safety or expose the Debtor to penalties. Accordingly, the Debtor believes it would be prudent to proactively exercise all measures to protect their employees, customers, or other individual creditors by redacting from public view, all personal home addresses.

32.     The Debtor proposes to provide, on a confidential basis, an unredacted version of the Creditor Matrix, Schedules and Statements, and any other applicable filings redacted pursuant to the Orders to (a) the Court, the U.S. Trustee, and the Sub-V Trustee appointed in this Chapter 11 Case, and (b) upon a request to the Debtor or to the Court that is reasonably related to this Chapter 11 Case, any party in interest. In addition, the Debtor will distribute to their current employees any notices that are received at the Debtor's corporate headquarters and are intended for an employee. The Debtor respectfully submits that this tailored approach of maintaining public access to the Creditor Matrix, Schedules and Statements, and other applicable filings – without

-11-

publishing sensitive personally identifiable information of individuals on the worldwide web – is warranted and reasonable given the circumstances.

c. <u>Motion to Continue Using Existing Cash Management System</u>

33. In accordance with its operations, the Debtor maintains a cash management system designed to, among other things, efficiently collect, concentrate, and disburse the funds generated by the Debtor's business operations (the "<u>Cash Management System</u>").

34. The Cash Management System is designed to collect funds either at the restaurant level, for cash payments, or at the operating account level for credit card and food delivery platform payments.  Each of the restaurants has a Bank Account with a local branch of Bank of America where the cash receipts for the days are deposited daily (collectively, the "<u>BOA Restaurant Accounts</u>").  The BOA Restaurant Accounts, as needed (approximately once per month), get manually swept into a single Bank of America restaurant account (#2539) and, as historically done, transferred to an operating account at Cambridge Trust Company (#CT 9500) (the "<u>CTC Account</u>").  The CTC Account is then transferred into the Debtor's main operating account at Walden Mutual Bank (#3051) (the "<u>Operating Account</u>").  The CTC Account and Operating Account are FDIC Insured Bank Accounts.  All of the Bank Accounts shall be referred to as the "<u>Bank Accounts</u>."

35. In addition to the cash receipts transferred from the restaurants, all credit card payments, electronic payment platforms (such as Wave and Square), and food delivery platform receipts are deposited directly in the Operating Account at Walden Mutual Bank.  The Operating Account is used to pay all operating expenses of the Debtor and ADP, a third-party payroll processor, withdraws payroll, including all necessary taxes, insurance, and benefits, bi-weekly from the Operating Account.  There is a Director of Finance who is largely responsible for monitoring and overseeing the Debtor's receipt and disbursement activity, however, the Chief

Executive Officer and two (2) additional finance team personnel are also responsible for such duties. This is the team responsible for oversight of the account facilitates, *inter alia*, the Debtor's cash forecasting, the monitoring of collections, control and approval of the disbursement of funds and management of liquidity requirements.

36.     The Debtor seeks to continue to use the existing Cash Management System, including all Bank Accounts during the pendency of the Chapter 11 Case in a manner consistent with its prepetition practice and to avoid disruption and delay at a time when cash preservation is critical.  Additional information related to the Bank Accounts is set forth on **Exhibit C** attached to the cash management motion.

37.     The Debtor has other additional accounts not mentioned above that are not utilized and do not maintain a balance.  There is also a savings account at Cambridge Trust Company for the purposes of establishing a letter of creditor for a certain landlord. For the avoidance of doubt, the Debtor does not have any other accounts, including depository or investment accounts, except as set forth on Exhibit C and thus is not seeking any relief under section 345(b) of the Bankruptcy Code.

        d.     <u>Motion for Use of Cash Collateral</u>

38.     Prior to the Petition Date, the Debtor and Blue58, LLC ("<u>Blue58</u>"), as collateral agent for the secured lenders set forth on **Exhibit C** (collectively with Blue58, the "<u>Lenders</u>") entered into a loan facility pursuant to the following documents and instruments: (a) various Promissory Notes, from the Debtor payable to Lenders in the aggregate principal amount of $754,000.00 (the "<u>Notes</u>") and (b) a Secured Promissory Note Purchase Agreement, dated October 13, 2023, that included various other documents, including, but not limited to, a Guarantee, Security Agreement, and Collateral Agent Agreement (the "<u>Security Agreement</u>" and collectively with the Notes, the "<u>Prepetition Loan Documents</u>" and such loans extended thereunder, the "<u>Prepetition Loans</u>").

-13-

39.     In connection with the Prepetition Loan Documents, Blue58, as collateral agent, filed a UCC-1 Financing Statement with the Delaware Secretary of State on October 13, 2023, designated as filing number 20233731682 (the "Financing Statement").  As of the Petition Date, the Debtor is indebted to the Lenders under the Prepetition Loan Documents in an aggregate amount, including appropriately accrued interest and other valid fees, of not less than $754,000.00 (the "Prepetition Obligations").

40.     On information and belief, the Prepetition Obligations are secured, pursuant to the Prepetition Loan Documents, by perfected first-priority liens and security interests granted by the Debtor upon all of the "Collateral" (as defined in the Security Agreement) existing as of the time immediately prior to the Petition Date, which would include Cash Collateral (collectively, together with any other property of, among other things, the Debtor's estate in which a lien or security interest has been granted to or for the benefit of the Lender immediately prior to the Petition Date, the "Prepetition Collateral").

41.     Each of the Lenders or an affiliate of the Lenders is either a shareholder and/or member of the Debtor's board of directors.  Prior to entering into the Prepetition Loan Documents, the Debtor established a disinterested committee of directors and shareholders to negotiate and review the terms of the Prepetition Obligations with the Lenders.

42.     The Debtor requires immediate access to the use of Cash Collateral on an immediate basis. In the absence of immediate access to Cash Collateral, the Debtor will be unable to continue operating its business during the Chapter 11 Case, preserve the value of its estate for the benefit of all parties in interest, and administer a value-maximizing chapter 11 process. The Debtor does not have sufficient cash and financing otherwise available at this time to operate its business, and the results of operating on such limited liquidity would cause immediate and irreparable harm to the Debtor's business and its estate.

-14-

274290561

43.     The Debtor submits that the Lenders, to the extent of the valid and perfected liens on the Prepetition Collateral, will be adequately protected notwithstanding Debtor's use of Cash Collateral. As demonstrated by the Debtor's projected budget (the "Budget"), a copy of which is attached to the cash collateral motion as **Exhibit B,** the Debtor will operate with positive cash flow during the proposed interim period.

44.     The anticipated cash revenues during the interim period, in combination with the agreed use of Cash Collateral, will allow the Debtor to continue to satisfy its obligations and preserve the Debtor's business.

45.     Debtor is unable at this time to obtain (1) adequate unsecured credit allowable under sections 503(b)(1) or 364(c)(1) of the Bankruptcy Code as an administrative expense, (2) unsecured credit allowable under section 364(a) or (b) of the Bankruptcy Code, (3) unsecured credit entitled to priority under section 364(c)(1) of the Bankruptcy Code, or (4) adequate secured credit under section 364(c)(2), (c)(3) or (d)(1), from any source other than the Lenders' Cash Collateral that would be sufficient to enable the Debtor to continue its business operations.

46.     For the foregoing reasons, the Debtor's continued use of Cash Collateral is necessary to preserve the value of its estate and maximize value for the benefit of all stakeholders.

e.     Motion to Pay Critical Vendors and PACA Claimants

47.     The Debtor filed its *Motion for Entry Interim and Final Order (I) Authorizing the Debtor to Pay or Honor Prepetition Obligations to Certain Critical Vendors; (II) Authorizing the Debtor to Pay Certain PACA Creditors; and (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Critical Vendor and PACA Obligations*.

A.     **Critical Vendors**

48.     In the ordinary course of their business, the Debtor purchases goods and/or services from certain vendors or suppliers whose continued, uninterrupted provision of such

-15-

goods and/or services will play a crucial role in maintaining the Debtor's ongoing business operations as a restaurant, caterer, meal box provider, and fresh farm-to-table vegetarian establishment utilizing local ingredients from small family farms (such vendors, the "Critical Vendors"). The Critical Vendors provide a variety of goods and services, all of which are required to continue the daily operations of Debtor's businesses.

49.    The Debtor and its advisors spent significant time and effort identifying business relationships which, if lost, could materially harm the Debtor's business, irreparably harm Debtor's reputation with vendors of limited ingredients, reduce its enterprise value, and/or affect the Debtor's reorganization strategy. In this process, the Debtor and its advisors considered a variety of factors, including the following: the goods or services provided; the Debtor's business needs for the goods or services provided; the consequences of non-payment; and the potential to move to an alternative vendor.

50.    Based on their consideration of these factors, the Debtor anticipates that most Critical Vendors will be perishable agriculture suppliers who do not qualify for PACA, restaurant suppliers, and service providers that do not have a contractual relationship with the Debtor and are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtor's operations or adversely affecting Debtor's operations and food quality.[1]

---

[1] The Debtor believes that keeping the identity of potential Critical Vendors confidential may assist them in reducing the number of prepetition claims that they must pay in order to continue receiving critical goods and services. Accordingly, a schedule of Critical Vendors has not been filed with this Motion and will not be made publicly available. Upon request by (a) the Office of the United States Trustee or (b) the chambers of the United States Bankruptcy Judge assigned to the Chapter 11 Case, a schedule of payments made in accordance with any order entered by the Court approving this Motion.

-16-

51.     Based on the Debtor's review, the Debtor believes that a payment cap of $175,000 per claimant and, in aggregate, a total of $500,000 will enable the Debtor to satisfy the prepetition claims of Critical Vendors. Regardless of amount owed, the potential impact upon the Debtor's operations in the event that any of the Critical Vendors ceased providing goods or services to the Debtor would be significant. Without the continued service of the Critical Vendors, the Debtor may be forced to abruptly suspend or even cease operations, which suspension or cessations would cripple the Debtor's business operation.

52.     The Debtor's failure to pay these Critical Vendors their prepetition claims, to the extent that such claims are fixed, non-contingent, liquidated, and undisputed (the "Critical Vendor Claims"), may extinguish the Debtor's access to necessary goods and services in the event that a vendor (i) is unfamiliar with the bankruptcy process, (ii) may be put out of business by the Debtor's nonpayment, (iii) will refuse to continue doing business with the Debtor if its prepetition claim remains unpaid, or (iv) may choose to continue doing business with the Debtor only upon the condition that the Debtor provides trade term accommodations such as advance deposits or payment by wire transfer prior to delivery. Any disruption in the supply of goods or services from these Critical Vendors may not only substantially impair the Debtor's reorganization efforts but, due to the nature of the Debtor's business, affect the health, safety, and quality of the Debtor's food and services.

53.     The Debtor will also maintain a matrix summarizing (a) the name of each Critical Vendor, (b) the amount paid to each Critical Vendor on account of its Claim and (c) the goods or services provided by such Critical Vendor.

### B.     PACA Claims

54.     The Debtor believes that a certain portion of the products they have purchased but not yet paid for prior to the Petition Date, and in the ordinary course of their businesses, may

qualify as "perishable agricultural commodities" under PACA. Under PACA, the term perishable agricultural commodity is generally defined as "fruits and fresh vegetables of every kind and character [whether or not frozen or packed in ice]." 7 U.S.C § 499a(b)(4). PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust (the "PACA Trust") consisting of a buyer's entire inventory of food or other derivatives of perishable agricultural commodities, the products derived therefrom and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets"). See 7 U.S.C. § 499e(c)(2). Assets subject to a PACA Trust are preserved as a non-segregated floating trust and may be commingled with non-trust assets. Funds held in a PACA Trust are not property of a debtor's estate. *In re Kornblum & Co.,* 81 F.3d 280, 284 (2d Cir. 1995)

55.     Certain of the Debtor's suppliers (collectively, the "PACA Claimants") will be eligible to assert potential claims under PACA (collectively, the "PACA Claims").  In exercising their rights under PACA, PACA Claimants impose a PACA Trust on certain of the products granting them priority ahead of all other secured and unsecured creditors of the Debtor's estate. Accordingly, payment of PACA Claims at this time will not prejudice of affect the amount available for distributions to other creditors of the Debtor.  As such, the Debtor proposes that the Court approve payment of the PACA Claims, as discussed below, to ensure that the supply of fresh produce and related products critical the Debtor's on-going operations continues unimpeded.

56.     If the Debtor determines that a claim (or a portion of a claim) asserted is a valid PACA Claim, the Debtor shall pay such claim (or a portion thereof) upon such determination or in accordance with normal trade terms (the "Allowed PACA Claim").  Any holder of a PACA Claim that accepts payment from the Debtor on account of its Allowed PACA Claim shall be deemed to have waived, released, and discharged any and all claims, of any type, kind, or priority

274290561

on account of or in connection with its PACA Claim against the (i) Debtor, (ii) any former, present, or future officer, director, or employee of the Debtor, and (iii) the Debtor's assets and properties.

57.     The Debtor will also maintain a matrix summarizing (a) the name of each PACA Claimant, (b) the amount paid to each PACA Claimant on account of its PACA Claim and (c) the perishable agricultural commodity provided by such PACA Claimant.

         f.      Motion to Authorize Payment of Prepetition Salary, Wages, Insurance, and <u>Taxes</u>.

58.     The Debtor filed the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Certain Prepetition Salary, Wages, Insurance, and Taxes, (B) Continue to Fund Such Obligations, and (II) Granting Related Relief.*

## A.     <u>Wages and Salaries</u>

59.     Clover's workforce includes both salaried and hourly employees. Clover has a Chief Executive Officer, a Chief Marketing Officer, a Senior Vice President of Food Systems and Wholesale, and a Director of Finance.  The Director of Finance is supported by two full-time employees in the finance department.  In total, Clover has 35 full-time employees on the corporate support/leadership team across the company (collectively, the "<u>Salaried Employees</u>"). There are also 53 full-time hourly employees in the restaurants, commissary, and logistics (the "<u>FT Hourly Employees</u>").  Most of Clover's employees are employed part-time and, at current capacity, Clover employs nearly 185 part-time employees in the restaurants, commissary, and as drivers (collectively, the "<u>Hourly Employees</u>" and with the Salaried Employees and FT Hourly Employees, the "<u>Employees</u>").

60.     All Employees are paid in arrears on a biweekly basis.  For example, in October 2023, a pay period for all Employees commenced on Saturday, October 14, 2023 and ended with all Employees being paid on Friday, October 27, 2023.  The Debtor utilizes ADP Payroll Services

("ADP") to process its biweekly payroll, including all required tax and other withholdings for the payroll (collectively, the "Payroll").  The biweekly Payroll of the Debtor, including all amounts to be withheld, is an average of $350,000.

61.     In this case, the Petition Date fell in the middle of a payroll period that began prepetition on October 28, 2023, with a post-petition end date of November 10, 2023.  The timely payment of the Payroll to creditors is necessary and critical to the Debtor's on-going operations.  The Debtor cannot operate without its Employees.  If the Debtor were to miss even a portion of the forthcoming Payroll, delaying payment until § 507(a)(4) claims are paid, it would cause great prejudice with respect to the retention of its Employees and quality of food and services to customers.

62.     The Debtor seeks to pay the prepetition portion (~$175,000.00) of payroll for October 28, 2023-November 3, 2023, as part of the regularly scheduled Payroll set to be paid on November 10, 2023 ($350,000).  It is imperative for the Employees to be paid to maintain moral and the quality of food and services at the restaurants.

## B.     Insurance

63.     The Debtor's health, dental, and eye insurance are all pre-paid for future dates, with all prepetition amounts outstanding having been paid in full prior to the Petition Date.  However, the Debtor has financed its umbrella, auto, and D&O insurance coverage over monthly installments.  The D&O policy had a one-time broker fee of $2,355.00 in the full, annual premium amount – or approximately $196.25 per monthly installment.  The following table sets forth the amounts payable on the Debtor's monthly insurance premiums:

| Finance Company | Insurance Type | Monthly Amount | Due Date |
|---|---|---|---|
| Bank Direct | D&O Liability | $2,043.37 | 11/11/2023 |
| Bank Direct | Umbrella | $5,438.80 | 11/17/2023 |
| Acadia | Auto | $18,004.82 | 11/16/2023 |

-20-

64.     The maintenance of these insurance policies is critical to the safety of the client and its creditors.  These amounts are paid monthly through the end of the year and until renewal for next year.  The Debtor and its estate will be severely prejudiced if it is not permitted to pay its prepetition insurance premiums and maintain insurance coverage.

65.     The Debtor seeks authority to pay the regular monthly premium payments for the D&O liability, umbrella, and auto insurance policies in the aggregate amount of $25,486.99 as they come due.

**C.     Taxes**

66.     All federal, state, and local withholding taxes for the Employees are automatically withdrawn and included in the Payroll amount requested above.  However, the Debtor has additional prepetition tax obligations that it request to pay.  First, the Debtor pays a Massachusetts corporate tax three times per year.  The final 2023 is due in December in the amount of $6,000. The Debtor requests authority from the Court to timely remit this tax payment to the Commonwealth of Massachusetts.  It is imperative that Debtor remain current and in good standing with Massachusetts.

67.     Second, the Massachusetts Department of Revenue ("MDOR") charges the Debtor a twice monthly meals and sale taxes based on a variety of factors.  On the 25th day of each month, the Debtor remits on all restaurant sales for the first 21 days of that specific month.  In this case, the Debtor anticipates owing Massachusetts $45,000 based on sales from November 1-November 21 of this year.  Then, on the final day of the month, Massachusetts finalizes all sales and meal taxes for the preceding month.  In this case, the Debtor anticipates owing Massachusetts an additional $25,000 on November 30, 2023, for final meal and sales taxes owed for October 2023. The Debtor will also owe taxes for final prepetition November sales on December 31, 2023.

274290561

68.     The Debtor requests authority to remit: (i) the meal and sales tax of approximately $45,000 to MDOR on November 25, 2023 for the period of November 1-November 21; (ii) the final October 2023 meal and sales tax of approximately $25,000 to MDOR on November 30, 2023; and (iii) the final November 2023 meal and sales tax of approximately $25,000 to MDOR on December 31, 2023 (which would contain final taxes for November 1-November 3).

69.     As set forth in the motion, the nature of the salary, wages, insurance and taxes, the substantial harm to the Debtor's business that would be caused if such obligations were not honored, and the related potential for loss of value in the Debtor's estate, demonstrate that the salary, wages, insurance and taxes fall well within the scope of obligations for which payment may be authorized pursuant to the 11 U.S.C. §§ 105(a), 363(b), and the doctrine of necessity

g.      Motion to Approve Proposed Adequate Assurance of Payment to Utility Companies

70.     To facilitate operations, the Debtor receives services from various utility companies and other providers (collectively, the "Utility Companies") for the provision of sewer, water, gas, waste, electrical, telephone, cellular, internet, recycling, composting, and other similar utility services (collectively, "Utility Services"). The Utility Companies include, without limitation, the entities set forth on the list attached to the utility motion as **Exhibit C** (the "Utility List").  Each of the restaurants has its own utility services all contracted through the Debtor.

71.     The Utility Services are essential to the continued operation of the Debtor's business and, consequently, to the success of the Chapter 11 Case. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted, and such disruption would jeopardize the Debtor's restructuring efforts. Accordingly, the Debtor seeks to establish an orderly process for providing adequate assurance to the Utility Companies without hindering the Debtor's ability to operate as a going concern.

-22-

72.     The Debtor proposes the following as adequate assurance of payment for continued utility services for each of the Utility Companies:

    a.    Consistent with section 366(c)(1)(A) of the Bankruptcy Code, which defines the phrase "assurance of payment" to include a "cash deposit," the Debtor proposes to deposit, within 20 days of the Petition Date, one (1) month of Utility Services calculated as a historical average of all billings for Utility Services incurred by the Debtor (each an "<u>Adequate Assurance Deposit</u>"), into a segregated bank account designated for the Adequate Assurance Deposits on behalf of all Utility Companies identified in **Exhibit C** (the "<u>Adequate Assurance Deposit Account</u>"). The Adequate Assurance Deposit may be applied to any postpetition defaults in payment to the Utility Companies

    b.    All funds held in the Adequate Assurance Deposit Account shall be returned to Debtor upon the earliest to occur of: (a) confirmation of a Chapter 11 plan of reorganization or liquidation with respect to the Debtor; (b) the closing of a transaction or series of transactions that in aggregate result in the sale of substantially all of the Debtor's assets; (c) conversion of this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (d) dismissal of this Chapter 11 Case; or (e) conclusion of this Chapter 11 Case

73.     The Debtor is proposing the same type of assurance as has been proposed in previous chapter 11 cases in this district and believes that the Adequate Assurance Deposit Account, together with the proposed Adequate Assurance Procedures, strikes a fair balance between the rights of the Utility Companies and the interests of the Debtor's estate. The Debtor operates restaurants, catering, meal box services, and food delivery, and if the Utility Companies altered, refused or discontinued service, even for a brief period, the Debtor's business operations would be severely disrupted. Such disruption could have a devastating impact on the Debtor's business functions and revenues, thereby jeopardizing the Debtor's restructuring efforts. By contrast, the Utility Companies will have received the protection of a cash deposit equal to one month's worth of Utility Services, and may receive this deposit in the event that the Debtor fails to timely pay its postpetition utility charges. It is, therefore, critical that this Court grant the relief

274290561

requested in this Motion and prohibit the Utility Companies from altering, refusing, or discontinuing the Debtor's necessary Utility Services during this Chapter 11 Case.

> h.    Motion to Honor Prepetition Gift Cards and Customer Programs

74.    The Debtor filed its *Motion for Entry of Interim and Final Order Authorizing the Debtor to (I) Honor Gift Cards and (II) Administer Existing Customer Programs in the Ordinary Course of Business*.  To continue the Debtor's goodwill with its customers, and to ensure that such customers do not suffer any financial or loyalty loss as a result of the Chapter 11 Case, the Debtor seeks authority to continue its Customer Programs (defined below).

**A.    The Gift Card Program**

75.    In the ordinary course of business, the Debtor issues physical pre-paid, non-expiring gift cards (the "Gift Cards" and such program, the "Gift Card Program") to customers for in restaurant dining or purchase of a meal box subscription.

76.    The Debtor estimates that, as of the Petition Date, approximately $40,000 in purchased and unredeemed Gift Cards outstanding through Square and approximately $3,000 in purchased and unredeemed Gift Cards outstanding through Stripe on its balance sheet.

77.    To ensure that the Debtor's customers can use their existing Gift Cards, the Debtor seeks authority to maintain the Gift Card Program after the Petition Date in the ordinary course of business and to honor all Gift Cards, consistent with the Debtor's prepetition practice.

**B.    The Loyalty Program**

78.    In addition, the Debtor offers exclusive discounts and promotions for loyal customers, such as a discount for the recently issued Thanksgiving meal box (the "Loyalty Program" and such program, the "Loyalty Program," and together with the Gift Card Program, the "Customer Programs"). These customers are offered discount codes and other bonuses, similar to an old-fashioned coupon system, through the app.  For example, heading into the Thanksgiving

season, the Debtor has offered those customers that early order a Thanksgiving meal box a 20% discount code through the online.  These type of promotions and loyalty discounts are all part of the Debtor's Loyalty Program and a significant draw to the retention of customers.

79.     To ensure that the Debtor's customers are provided their full benefits from the Loyalty Program, the Debtor seeks authority to maintain the Loyalty Program after the Petition Date in the ordinary course of business and to honor all Loyalty Program discounts and promotions, consistent with the Debtor's prepetition practice.

80.     The ability to continue administering the Customer Programs without interruption is critical to the Debtor's valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtor's stakeholders. If the Debtor is unable to continue the Customer Programs as described herein, the Debtor risks alienating customers and could suffer corresponding losses in customer loyalty and goodwill that will harm its prospects for a successful reorganization.

81.     The Customer Programs are also essential for attracting new customers. Failure to continue the Customer Programs and offer programs, such as the Gift Card Program, will place the Debtor at a significant competitive disadvantage against the other restaurants, catering business, or meal box options in Boston, Massachusetts. Such uncertainty could erode the Debtor's hard-earned customer loyalty, which, in turn, could adversely impact its ability to successfully administer its Chapter 11 Case.

82.     The benefits of continuing to honor the Customer Programs outweigh the minimal associated costs. As such, the Debtor respectfully requests the entry of the Interim and Final Orders authorizing the Debtor to continue to honor the Customer Programs in the ordinary course of business.

**VI.    Additional Anticipated Relief**

83.    Following hearing on the First Day Motions, the Debtor anticipates seeking additional relief from the Court that may include, without limitation, the following requests:

　　　　　　　　a.    Employment Applications

84.    The Debtor seeks to employ professionals pursuant to 11 U.S.C. § 327(a), including Clark Hill PLC, as bankruptcy counsel, and Newpoint Advisors LLC, as financial advisor. Furthermore, the Debtor will be seeking to employ special leasing counsel to assist with the termination and renegotiation of leases and corporate counsel to assist in the corporate restructuring anticipated though the confirmation of the Chapter 11 plan.

　　　　　　　　b.    Professional Administrative Fee Procedures

85.    In order to regulate the Debtor's cash flow, without overburdening its restructuring efforts during the Chapter 11 case or at confirmation, the Debtor will seek an order establishing professional administrative fee procedures. The fee procedures will allow professionals employed pursuant to 11 U.S.C. § 327 to receive payment each month on an interim basis of 80% of fees and 100% of reimbursement. The professionals will still be required to file a fee application for final approval of all fees and costs and payment of the 20% hold-back.

　　　　　　　　c.    Debtor-in-Possession Financing

86.    The Debtors and Lenders are negotiating terms on additional post-petition financing to carry the Debtor through the Chapter 11 case and emergence through bankruptcy. It is anticipated the debtor-in-possession financing will be on terms similar to those provided in the cash collateral motion, without waiver of any substantial rights, remedies, or causes of action from the Debtor. The Debtor anticipates that, upon confirmation of a Chapter 11 plan, the outstanding prepetition and post-petition financing will convert to equity in the reorganized debtor and a reshuffled equity structure.

-26-

     d.     <u>Lease Rejection Motions</u>

87.     Currently, the Debtor anticipates that it will likely seek to reject the leases for three (3) unprofitable restaurants, including BBY, that was closed in August 2023, DTX, and ROW. The rejection of underperforming leases is the keystone to the Debtor's financial restructuring and return to overall profitability. The Debtor is hopeful that additional lease rejections will not be required and certain landlord will negotiate terms more favorable than those in current leases.

88.     I have reviewed each of the First Day Motions, the underlying operative documents and company records, the facts stated therein and the descriptions of the relief they request. I have reviewed same with the Debtor's management, together with the Debtor's counsel and advisors and, based on such review, believe that the contents of the First Day Motions and this Declaration are true and correct to the best of my information and belief.

Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Motions and the contents of the foregoing Declaration are true and correct to the best of my information and belief.

Dated: November 3, 2023                /s/ *Julia Wrin Piper*
                                           Julia Wrin Piper, Chief Executive Officer
                                           Clover Fast Food, Inc.

274290561