**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Subchapter V |
| CLOVER FAST FOOD, INC., | |
| | Case No. 23-11812 (BLS) |
| Debtor. | |

## MODIFIED CHAPTER 11 PLAN OF REORGANIZATION

Clover Fast Food, Inc., debtor and debtor in possession (the "**Debtor**" or "**Clover**"), by and through its undersigned counsel, hereby submits this Plan of Reorganization dated March 6, 2024 (the "**Plan**") and attached exhibits for consensual approval:

## ARTICLE I

### Summary

Through the Plan, the Debtor proposes to continue operating its business and, on the Effective Date, make Distributions to its Creditors from the Exit Financing provided from the Prepetition Lenders and DIP Lenders.  The Plan provides for three classes of claims and one class of interests. The first class consists of the Secured Claims of the ABL Lenders, Prepetition Lenders, and DIP Lenders, all of which shall remain impaired as of the Effective Date.  The second class of claims consists of all priority unsecured claims, which the Debtor proposes to pay in full, upon the Effective Date.  The third class consists of all general unsecured claims, including any deficiency claims of the IND Lenders and all lease rejection claims, which the Debtor proposes to pay *pro rata* a total of $250,000 through a consensual plan in full and final satisfaction on the Effective Date. The sole class of Interests consists of the same Interest Holders as they existed on the Petition Date.  The Plan proposes to allow Interest Holders to retain their Interests, upon confirmation of the Plan, as Allowed Interests in the Reorganized Debtor.

1

## **Disclaimer**

This Plan should be read in its entirety prior to voting. No solicitation of votes will be made except pursuant to this document. Therefore, for purposes of voting on the Plan, parties in interest should not rely on any information relating to the Debtor other than the information contained herein or as filed in the Bankruptcy Case. Please read this document carefully before voting on the Plan.

The Debtor is furnishing this Plan and form of ballot (attached hereto as **Exhibit A**) to holders of claims in impaired classes, pursuant to the requirements of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure ("**FRBP**"). Under § 1122 of the Bankruptcy Code, substantially similar claims are placed in classes. Under § 101(5) of the Bankruptcy Code, a "claim" means a right to payment or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. Generally, in the context of voting for confirmation of a plan of reorganization, a claim or interest is deemed impaired unless one of three conditions is met, namely, (i) the legal, equitable, and contractual rights of the holder are left unaltered by the plan; (ii) the plan provides for curing defaults occurring before or after commencement of the case; or, (iii) the holder receives cash for the allowed amount of the claim or for the fixed redemption price or liquidated value of the interest. Unimpaired claims are more specifically defined in § 1124 of the Bankruptcy Code. This Plan identifies the classes and whether these classes are deemed impaired or unimpaired under the Plan.

A holder of a claim or interest in an impaired class is entitled to vote to accept or reject the Plan if such claim or interest has been allowed pursuant to § 502 of the Bankruptcy Code or temporarily allowed for voting pursuant to FRBP 3018.

**YOUR VOTE IS IMPORTANT.**  Confirmation of the Plan and implementation of the proposed provisions and transactions under the Plan depends upon receipt of a sufficient number of votes in favor of the Plan.  If the Debtor has received a sufficient number of votes in favor of the Plan upon expiration of the solicitation period, the Debtor intends to seek confirmation of the Plan.

**The Plan sets forth the proposed treatment of each class of Claims and Interests.  You are urged to carefully review this Plan in full and to consult with your own legal and financial advisors about the Plan and its impact, including but not limited to possible tax consequences, upon your legal rights.**

**No representations concerning the Debtor, particularly as to the Debtor's financial condition, or the value of its property, are authorized by the Debtor except as set forth in this Plan.  Although great effort has been made by the Debtor to be accurate, the information contained herein or appended hereto as exhibits, has not been subject to a certified audit. Therefore, the Debtor is unable to warrant or represent that the information contained herein is without any inaccuracy.**

**Furthermore, while any dividend or distribution offered to any person or entity pursuant to the Plan may not meet the reader's understanding of the definition of "securities," such dividend may be deemed a "security" pursuant to federal or state securities laws.  Accordingly, the Plan should be evaluated in much the same manner as the purchase of a security would be evaluated.  The advice and assistance of competent professionals should be sought.**

275709514

**Background**

On November 3, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Pursuant to § 1184 of the Bankruptcy Code, the Debtor continues to manage its financial affairs as a debtor in possession.

## I.        History and Background of Clover Fast Food Inc.

Clover is a mission-based company with the goal of addressing climate change through the transformation of the American food system by making vegetable-based fast food and home cooking the most desirable of all diets. Its aim is always to win on flavor, not the logic of climate science. Clover sources all of its vegetables, grains, and as many other ingredients as possible locally to ensure consistent quality and freshness. It reaches its loyal customer base through brick-and-mortar locations, home-delivery meal box service, and catering, with its offerings rotating frequently to feature the most in-season vegetables as possible.

Currently, 85-90% of Clover's customers are not vegetarian (based on monthly in-store surveys), meaning that each meal Clover serves or delivers has a direct impact on reducing global warming. Vegetable-based meals can have as much as one twentieth (1/20) the greenhouse gas impact versus a normal meat-containing meal. Clover aims not to convert our customers to vegetarianism or veganism, but to make food so delicious that the average American will choose our fare over meat-based meals.

Clover has a vast library of over 1,500 tested recipes, which allows the company to pivot its menu offerings quickly based on farm pricing and the success (or failure) of certain crops. In its marketing, Clover emphasizes that its food "follows the seasons" and relies on sourcing from local farms. Murals in Clover locations proclaim, "The best food is made by your neighbors!," "Ask us what's in season today," and similar slogans. Clover's relationships with over 20 regional

farms and a vast number of small-scale artisanal producers (coffee roasters, tofu makers, pasta producers, tortilla experts) are a bedrock of the brand.

Clover started in 2008 when its founder Ayr Muir, an MIT-trained engineer and Harvard Business School graduate, parked a food truck in Cambridge, Massachusetts with the mission of figuring out how to create vegetable-based meals that meat lovers would preferentially purchase. The Clover food truck was a quick success with lines around the block and attention from the press.  In 2009, Clover was approached by the Greenway, an organization in Boston that operated the land impacted by the "Big Dig" construction project. The Greenway asked Clover to open a second food truck on its property in a prominent area near South Station called Dewey Square.

The food truck Clover operated at Dewey Square was the first food truck in the City of Boston in more than 20 years.  The success of the Clover food trucks led to an expansion into brick-and-mortar restaurants. Clover's first restaurant was in Harvard Square in 2011 and it soon found a large and dedicated customer base. Clover expanded to additional restaurants in Cambridge and Boston with a focus on serving students and office employees in dense urban areas.

The restaurants are supported by a commissary model. Clover signed a lease for a 20,000 square foot space in East Cambridge that serviced the restaurants and the food trucks, which at their peak numbered 10 trucks, rotating across 8 sites.  In 2016, Clover transitioned away from daily truck operations to focus on the more profitable restaurants, currently retaining two (2) food trucks for use at marketing events and catering.

Alongside its food business, Clover has developed an in-house, proprietary point-of-sale and kitchen display technology. Clover customers use a single, stream-lined digital platform to purchase from restaurants, set-up and manage meal box subscriptions, purchase and meal boxes and pantry items, and sign-up for community-supported farm shares. The technology also supports

275709514

the frequent updates to Clover's digital menus, which are constantly changing based on inventory and availability of new vegetables from the company's network of local farmers.

Clover has received local and national press coverage and accolades for its fresh, healthy, and innovative food offerings, including "Restauranteur of the Year" from the Massachusetts Restaurant Association in 2018 and Boston Magazine's "Best in Boston" Local Lunch Chain in 2022. Our meal box delivery service has also been featured extensively in local press coverage, most recently by Boston Magazine in April 2023, which said "the locally sourced boxes promise to transform even the staunchest meat eater into a veggie aficionado." Our catering offering has been seeing a recovery as well, and Clover has been chosen as a preferred caterer by MIT.

## II.    Events Leading to Bankruptcy Case

Clover was experiencing rapid growth pre-COVID and scale-driven improvements to company economics. In 2019, according to accounting practices at the time, the average unit volume of Clover's mature restaurants approached $1,700,000, a strong performance for fast casual restaurants, and an 18% 4-wall EBITDA. The pandemic had an immediate and lasting impact on Clover's business, as it did on all restaurants.

During the pandemic, Clover received support from government programs designed to protect businesses, including the employee retention tax credit. Clover also saw support from long-term investors in the form of convertible debt financing. Clover quickly pivoted in the pandemic, like many companies, and created a new business line in 2020 by selling daily meal boxes to people locked down in their homes. These meal boxes, which were created out of Clover's need to adapt to pandemic consumer market changes, has become a profitable business that contributes approximately 20% of Clover's annual revenue and has further potential for growth.

275709514

As the world emerged from the pandemic, in 2022 and 2023, Clover saw improved traffic and sales in its restaurants, and projected a full return to pre-pandemic sales volume by 2024. However, even at the end of 2023, restaurant traffic remained lower than pre-pandemic levels at brick-and-mortar locations, and all rental abatements and government assistance ceased. These dueling strains on liquidity played out just as Clover and its board of directors were looking to expand. At the beginning of 2023, in hopeful anticipation of a strong emergence from the pandemic, Clover's board and investors expected to raise growth equity to expand the company's footprint around New England and into New York City. Based on this plan, Clover signed a lease and started construction on a 2.5x larger commissary located at 50 Industrial Drive in Boston ("**IND**").

Unfortunately, Clover's expansion plans and equity raise coincided with the failure of Silicon Valley Bank and the subsequent slowing of growth equity financial markets. Despite fundraising efforts on behalf of Clover's Board and Ayr Muir (CEO at the time), the funding plan was unsuccessful. Clover's expansion-related costs remained intact, however, and the company was still liable for the long-term lease at IND. In May 2023, Clover finalized a term sheet for new capital that would raise enough funds to support up to eighteen (18) months of non-expansion operations. The plan was to operate current restaurant locations and company verticals, consistently growing sales and reducing costs, until revenue was sufficient to cover the on-going elevated expenses of the costly IND commissary and the few remaining struggling brick-and-mortar restaurants.

The first tranche of this funding was closed in May 2023 bringing in $1,800,000. In June, Clover also took a number of steps to try to conserve cash, including a 43% reduction in combined salary and hourly spend on corporate wages. Clover hoped to raise the second tranche by August

7

2023, but this did not come to fruition.  In reaction to this set of events, Clover set a focus on pursuing corporate profitability as quickly as possible. There were a few structural obstacles to this, specifically the lease for IND, and three (3) restaurants that have high rent and low sales. Clover attempted to work with these landlords on solutions that would set the company up for profitable operations.  Regrettably, these negotiations did not progress rapidly enough to create long-term viability, which led Clover to pursue relief as a small business debtor under Subchapter V of Chapter 11 of the Bankruptcy Code (11 U.S.C. § 101, *et seq*.).

## III.    Organizational Structure, Leases, and Operations

Prior to the Petition Date, Clover operated 12 restaurants, 2 kiosks within Boston-area Whole Foods, a catering business, and meal box production and delivery seven days per week to customers in and around Boston.  All of these business lines, including each restaurant, are owned and operated through Clover, a C-corporation.  As Clover approached the Petition Date, its founder Ayr Muir agreed to transition out of his role as Chief Executive Officer and member of the Board of Directors of Clover.  Julia Wrin Piper assumed the role of CEO shortly before filing.  Prior to becoming CEO, including a brief hiatus from the company, Ms. Wrin Piper served as Chief Operating Officer of Clover for eighteen (18) months.

Clover also has a Chief Marketing Officer, a Senior Vice President of Food Systems and Wholesale, and a Director of Finance, who is supported by two full-time employees in the finance department.  Clover has undertaken a strategic and focused reduction in its workforce since the Petition Date.  As of the Petition Date, Clover had 259 full-time and part-time employees.  As of December 31, 2024, Clover had 225 total employees.  Clover continues to review its payroll and services and determine whether any further reduction in payroll or workforce would be necessary or beneficial.

8

The Debtor's "**Restaurants**" are located throughout Boston, Cambridge, and the surrounding neighborhoods.  Clover does not own any of the real property on which the Restaurants are operated and each Restaurant is subject to an unexpired lease with a third-party landlord.  From a fiscal operating standpoint, the Restaurants today show a promising picture of post-pandemic recovery. However, from conversations with industry experts and customer anecdotes, that the slower recovery in sales in a few locations is attributable to more of the urban workforce working remotely in some capacity. All leases outside of NTV, PRU, and ROW were committed to before the pandemic, with different assumptions about in-person consumer behavior. The Debtor, in conjunction with its professionals, has undertaken an extensive examination of its current and future rental obligations to ensure long-term stability and profitability for the Debtor. There has been some success here and efforts will continue as set forth below.

## IV.     Restructuring Efforts and Chapter 11 Progress

The Debtor filed the Bankruptcy Case to permanently stabilize its finances through its review of all future lease commitments and examine additional financial restructuring, whether through cost-cutting or operational efficiencies, to further enhance its long-term liquidity.

1.     <u>Restaurant Operations</u>

During the Bankruptcy Case, the Debtor ceased operations at one (1) of the restaurants (ROW) and the remaining 11 restaurants are at the following locations throughout Boston, Cambridge, and surrounding neighborhoods:

> a.     "BUR" – Clover Burlington: 18 Burlington Mall Road (Burlington)
>
> b.     "DTX" – Clover Downtown Crossing: 27 School Street (Boston)
>
> c.     "FIN" – Clover Financial District: 160 Federal Street (Boston)

d.      "HFI" – Clover HFI/Central Square: 496 Massachusetts Avenue (Cambridge)

e.      "HSC" – Clover Harvard Science Center: 1 Oxford Street (Cambridge)

f.      "HSQ" – Clover Harvard Square: 1326 Massachusetts Avenue (Cambridge)

g.      "HUB" – Clover Hub/HQ in Inman Square: 1075 Cambridge Street (Cambridge)

h.      "KND" – Clover Kendall Square: 5 Cambridge Center (Cambridge)

i.      "LMA" – Clover Longwood Medical Area: 360 Longwood Avenue (Boston)

j.      "NTV" – Clover Newtonville: 835 Washington Street (Newton)

k.      "PRU" – Clover in the Prudential Center: 800 Boylston Street #15 (Boston)

2.      <u>Closure of IND</u>

In late 2021 and early 2022, Clover projected significant growth, which led the company to commit long-term to the significantly larger IND commissary.  The capital markets dried up as Clover was attempting to raise its new funding and it was left with an expensive, overly burdensome, and unfinished commissary.  The IND lease commenced in February 2022 and had a 10-year term.  Its base rent started in 2022 at $53,933 per month and increased to over $70,000 per month in its final year.  Clover negotiated a lease termination with IND's landlord on the eve of bankruptcy that permitted the landlord to retain Clover's security deposit in exchange for access to remove all equipment, plus a waiver of all past due arrears (greater than $200,000) and any future rent claims in the bankruptcy estate (15% of the remaining future rent is approximately $1,015,050).

Despite the prepetition closure of IND, the Debtor retained significant equipment and potential fixtures at IND that required removal.  In fact, the Debtor's intended industrial refrigeration system at IND was never unpacked or installed.  Since the Petition Date, the Debtor has learned that the refrigeration system was financed in five separate segments by four separate financing companies totaling nearly $1 million.  Lender Balboa Capital, which financed two of the segments, has agreed to abandon its interest in the refrigeration system and the three remaining refrigeration lenders, Ascentium Capital, Direct Capital (CIT), and Alliance Funding Group (collectively, the "**IND Lenders**"), have agreed to permit the Debtor to sell the still boxed up refrigeration system as a whole unit.  On January 30, 2024, the Debtor filed a motion to employ an auctioneer and sell the refrigeration system shortly and, after a continuance, is set for March 14, 2024 at 10:00 a.m. (ET) (the "**Auctioneer Motion**").  No objections were filed to the Auctioneer Motion and, on March 1, 2024, a *Certification of Counsel* regarding the Auctioneer Motion was filed [Docket No. 184].

      3.    <u>Retained Equipment</u>

The Debtor is continuing to review and determine what additional equipment it intends to assume or retain through the Bankruptcy Case.  The Debtor has reached out to equipment lender, M2, about the return of one of the two box trucks M2 financed prior to the Petition Date and utilized in its meal box delivery program.  M2 has agreed, in principle, to accept the return of one box truck and the Debtor's retention of the remaining box truck.  A stipulated relief from stay will be filed shortly in the Bankruptcy Case.  The Debtor is continuing to review its equipment inventory and determine what, if any further, should be rejected or abandoned during the Bankruptcy Case.

275709514

4.    <u>Restaurant Leases</u>

a.    ROW – the Debtor's location at 330 Foley Street in Somerville, Massachusetts was underperforming prior to the Petition Date. *See* Docket No. 3 at ¶ 87.  The Debtor's landlord terminated the lease prepetition and the Debtor had hoped to negotiate more financially accommodating terms with the landlord.  Unfortunately, the Debtor and ROW landlord could not reach an agreement on new lease terms and the Debtor surrendered the property to landlord on November 30, 2023.  The ROW landlord had expressed a potential interest in retaining or purchasing certain equipment at ROW and, as such, certain *de minimis* personal property remains at ROW, and will be abandoned on the Effective Date, retroactive to November 30, 2023.

b.    DTX – the Debtor entered Chapter 11 anticipating that it would need to surrender its location at 27 School Street in Boston, Massachusetts if more reasonable terms could not be reached with the DTX landlord. *See* Docket No. 3 at ¶ 27.  However, the Debtor and DTX landlord have continued to negotiate terms for a new lease and Debtor continues to operate its restaurant at 27 School Street.  Negotiations with the landlord are on-going with anticipation of completion prior to the Effective Date.

c.    KND – on December 5, 2023, the Debtor filed a motion to assume the KND lease based on a written offer from the landlord for a one-year extension.  On December 13, 2023, the Debtor received a call from counsel for the KND landlord objecting to the relief requested but seeking a consensual resolution.  The Debtor and KND landlord resolved the objections and submitted an agreed order approving a mutual extension of the KND lease through and including October 31, 2024.  The Debtor is continuing to review its options for a new location in the Kendall Square area of Cambridge.

d.      Extension of Time – the Debtor's long-term real estate leases are its largest on-going operating expense.  On January 23, 2024, the Debtor filed a motion to extend time to assume or reject all unexpired leases of real property seeking an extension of time through and including May 31, 2024 [Docket No. 147].  The Debtor has reached out to all landlords to explore the possibility of restructuring its leases to more beneficial terms and expects to resolve all negotiations on or before the Effective Date.

5.      <u>Debtor in Possession Financing</u>

Prior to the Petition Date, the Debtor and Blue58, as collateral agent for the Prepetition Lenders, entered into a loan facility pursuant to the following documents and instruments: (a) various Promissory Notes, from the Debtor payable to Prepetition Lenders in the aggregate principal amount of $754,000.00 (the "**Prepetition Notes**") and (b) a Secured Promissory Note Purchase Agreement, dated October 13, 2023, that included various other documents, including, but not limited to, a Guarantee, Security Agreement, and Collateral Agent Agreement (the "**Prepetition Security Agreement**" and collectively with the Prepetition Notes, the "**Prepetition Loan Documents**" and such loans extended thereunder, the "**Prepetition Loans**").

In connection with the Prepetition Loan Documents, Blue58, as collateral agent, filed a UCC-1 Financing Statement with the Delaware Secretary of State on October 13, 2023, designated as filing number 20233731682 (the "**Financing Statement**").  As of the Petition Date, the Debtor was indebted to the Lenders under the Prepetition Loan Documents in an aggregate amount, including appropriately accrued interest and other valid fees, of not less than $754,000.00 (the "**Prepetition Obligations**").  On the Petition Date, the Debtor filed its *Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Scheduling a Final Hearing, and (III) Granting Related Relief* [Docket No. 9] (the "**Cash Collateral Motion"**) for the use of the

13

Lenders' cash collateral during the interim period and, subsequently, for final approval. The Cash Collateral Motion was subsequently granted on an interim and final basis.

On November 29, 2023, the Court entered the *Final Order (I) Authorizing the Debtor to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Granting Senior Pari Passu Liens to the DIP Lenders, and (III) Granting Related Relief* [Docket No. 87] (the "**Final DIP Order")** authorizing, *inter alia*, the Debtor to obtain $600,000 in postpetition debtor-in-possession financing. The Debtor received those funds with the understanding and acknowledgment that additional financing would be required in the Bankruptcy Case.

On December 14, 2023, the Debtor filed its *Motion for Entry of a Final Order (I) Approving Amended Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code to Increase the DIP Amount, (II) Continuing Senior Secured Lien Pari Passu to the Lenders, and (III) Granting Related Relief* [Docket No. 105] to increase the approved debtor-in-possession financing up to $1,850,000, with an additional $900,000 committed to the Debtor during the Bankruptcy Case.

The increased DIP financing has been utilized to carry out the Debtor's restructuring goals during the Bankruptcy Case and propel it to plan confirmation. The Debtor has approached the DIP Lenders (and Prepetition Lenders) about the structure of the Prepetition Loans and DIP financing in the post-confirmation Debtor. As discussed below, the DIP Lenders and Prepetition Lenders have agreed to roll-up the Prepetition Loans and DIP financing into a new post-confirmation Exit Financing facility.

**Confirmation Hearing and Voting Procedures**

A.      Hearing to Confirm Plan and For Final Approval of Disclosure Statement

The hearing at which the Bankruptcy Court will determine whether to confirm the Plan will take place on **March 14, 2024 at 10:00 a.m. (Eastern Time)** (the "**Confirmation Hearing**"), and will be presented and heard in person at the United States Bankruptcy Court for the District of Delaware at:

> 824 N. Market Street
> 6th Floor, Courtroom 1
> Wilmington, DE 19801

You may also be permitted to appear and be heard via eCourt Appearance. You must review the Court's online eCourt Appearance procedures (https://www.deb.uscourts.gov/ecourt-appearances) to determine whether you are eligible to appear electronically. If eligible, instructions for virtual appearance via eCourt Appearance will be provided prior to the scheduled Confirmation Hearing.

B.      Voting Deadline

The Bankruptcy Court has set **March 4, 2024** ("**Voting Deadline**") as the date by which ballots to accept or reject the Plan by Creditors and Interest Holders entitled to vote must be received by the Debtor's counsel. All ballots **must be received by the Debtor's counsel via U.S. Mail, Overnight Delivery or Hand Delivery** at the following address on or before the Voting Deadline:

> CLARK HILL PLC
> Attn: Kevin H. Morse
> 130 East Randolph Street | Suite 3900
> Chicago, Illinois 60601
> T: (312) 985-5556
> kmorse@clarkhill.com

A copy of this Plan and a notice of the Confirmation Hearing to accept or reject the Plan are being sent to all Creditors and Interest Holders. **Ballots are being sent to Holders of Claims**

and Interests which are impaired under this Plan.  **The ballot must be properly completed pursuant to the instructions thereupon and must be received by the Debtor's counsel on or before the Voting Deadline**.  A copy of your ballot is attached hereto as **Exhibit A**.  The completed ballot must clearly indicate whether the vote is cast to accept or to reject the Plan, and must be signed by the Creditor or Interest Holder or his or her authorized agent.  If a ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing the ballot and attach proper evidence of his or her authority to so act.  **A BALLOT NOT PROPERLY EXECUTED OR RECEIVED BY THE VOTING DEADLINE SHALL NOT BE COUNTED.**

Pursuant to Federal Rule of Bankruptcy Procedure 3018(a), the Bankruptcy Court, after notice and a hearing, may permit a creditor or equity security holder to change or withdraw an acceptance or rejection for cause.

C.    Objection Deadline

The Bankruptcy Court has set **March 4, 2024** ("**Objection Deadline**") as the date by which any objection to the Plan must be filed and served.  Any objections to confirmation of the Plan must be filed on or before the Objection Deadline**,** and served via U.S. Mail, postage prepaid, and/or electronic mail on: (1) Clover Fast Food, Inc., 1075 Cambridge Street, Cambridge, Massachusetts 02139 (Attn: Kevin H. Morse [kmorse@clarkhill.com] and Karen Grivner [kgrivner@clarkhill.com]); (2) the Office of the United States Trustee (Attn: Linda Casey [linda.casey@usdoj.gov]); (3) the Subchapter V Trustee, David Klauder [dklauder@bk-legal.com]; and (4) any party that has requested notice pursuant to FRBP 2002.

# ARTICLE II

## Definitions

Capitalized terms used in the Plan shall, unless otherwise defined herein, have the meanings or rules of construction as are assigned to each under the Bankruptcy Code. In construing the defined term or terms used in the Plan, the (i) singular shall include the plural and the plural shall include the singular, (ii) conjunctive shall include the disjunctive and the disjunctive shall include the conjunctive, and (iii) reference to any gender shall include any other gender as appropriate. Unless the context otherwise requires, the following terms used herein shall have the meaning specified hereinafter:

2.01    "ABL Lenders" means all lenders set forth on **Exhibit B** with a perfected purchase money security interest in equipment the Debtor owns and utilizes in its operations.

2.02    "Allowed Administrative Expense Claim" means an Allowed Claim arising from costs or expenses of administration of the Debtor's Estate incurred after the Petition Date allowed under § 503(b) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Debtor's estate and all compensation or reimbursement of expenses to the extent approved by the Bankruptcy Court under § 330 of the Bankruptcy Code.

2.03    "Allowed Claim" means any Claim in the amount and the priority classification set forth (a) in the Schedules or (b) in the proof of such Claim that has been filed in this Bankruptcy Case, unless: (i) such Claim has been listed in such Schedules as disputed, contingent, or unliquidated, and no proof of such Claim has been filed in the Bankruptcy Case; (ii) such Claim has been objected to or is objected to prior to the Claim Objection Deadline, in which case such claim shall be allowed only in such amount and such classification as is authorized by Final Order of the Bankruptcy Court; or (iii) such Claim has been paid in full, withdrawn or otherwise deemed

275709514

satisfied in full. An Allowed Claim shall not include unmatured interest accruing after the Petition Date or penalties unless otherwise stated in the Plan.

2.04    "Allowed Interest" means an Interest in the Debtor in the nature of an Interest of any sort, including all Interests in the Debtor set forth on **Exhibit C**.

2.05    "Allowed Priority Claim" means any Claim against the Debtor that, if Allowed, would be entitled to priority in payment under § 507(a) of the Code.

2.06    "Allowed Secured Claim" means an Allowed Claim secured by a valid, enforceable and properly perfected Lien on Estate Property, in an amount which is not in excess of the value of the Estate Property subject to such Claim and only to the extent of the value of the Lien of the Holder of such Allowed Claim in such Estate Property, determined in accordance with § 506 of the Bankruptcy Code.

2.07    "Allowed Unsecured Claim" means an Allowed Claim (a) which is not entitled to priority under § 507(a) of the Bankruptcy Code; (b) as to which the claimant does not have a validly perfected enforceable Lien as defined in §§ 101(43), (44) and (45) of the Bankruptcy Code; (c) arising from the deficiency between the sale price of the property subject to a Lien and the amount of the Allowed Claim secured by the Lien; or (d) which is listed as an undisputed Unsecured Claim in the Debtor's bankruptcy schedules.

2.08    "Bankruptcy Case" means the bankruptcy case filed on the Petition Date under Subchapter V of Chapter 11 of the Bankruptcy Code, entitled *In re Clover Fast Food, Inc.*, and presently pending before the Bankruptcy Court as Case No. 23-11812.

2.09    "Bankruptcy Code" means Title 11 of the United States Code. 11 U.S.C. § 101. *et. seq.*, as amended.

18

2.10    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

2.11    "Bankruptcy Rules" means the Rules of Bankruptcy Procedure adopted by the Supreme Court of the United States, as amended from time to time.

2.12    "Blue58" means Blue 58, LLC, as collateral agent for the Prepetition Lenders and DIP Lenders.

2.13    "Business Day" means any day other than a Saturday, Sunday, or "legal holiday" as that term is defined in Bankruptcy Rule 9006(a).

2.14    "Chapter 5 Claims" means all causes of action available to the Estate under Chapter 5 of the Bankruptcy Code.

2.15    "Chapter 11" means Chapter 11 of the Bankruptcy Code.

2.16    "Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.17    "Claim Objection Deadline" means, as set forth in Section 6.03 of this Plan, the deadline to file an objection to any Claim shall be the later of 120 days after the Effective Date or 120 days after a proof of Claim has been filed.

2.18    "Class" means a category of Holders of Claims as defined in § 1122 of the Bankruptcy Code.

2.19    "Confirmation Date" means the date on which the Confirmation Order is entered by the Clerk of the Bankruptcy Court in the docket for the Case.

2.20    "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to § 1191 of the Bankruptcy Code.

2.21    "Creditor" means any Person that holds an Allowed Claim.

2.22    "Debtor" means Clover Fast Food, Inc., a Delaware corporation.

2.23    "DIP Lenders" means Blue58 and Little Harbour SAZ, LLC.

2.24    "Disputed Claim" means any scheduled or filed Claim with respect to which an objection has been interposed prior to the Claim Objection Deadline in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Plan, or an order of the Bankruptcy Court.

2.25    "Distribution" means the cash and other consideration distributed by the Debtor under the Plan.

2.26    "Effective Date" means the later of: (i) the date the Exit Financing is funded to the extent of $1,000,000; or (ii) April 1, 2024, unless otherwise extended by subsequent order of the Bankruptcy Court.

2.27    "Estate" means the estate created upon the commencement of this Bankruptcy Case pursuant to § 541(a) of the Bankruptcy Code.

2.28    "Estate Property" means all property in which the Debtor has an interest, as defined in § 541(a) of the Bankruptcy Code.

2.29    "Exit Financing" means the lending facility provided from the Prepetition Lenders and DIP, as set forth on **Exhibit D**, and to be set forth in definitive loan documents filed with the Bankruptcy Court as a supplement to the Plan prior to the Objection Deadline.  The Exit Financing consists of the roll-up of the Prepetition Loans and DIP Financing, plus an additional $1,000,000

in funding.  The Exit Financing may convert to preferred equity at a future date following the Debtor's achievement of certain milestones and at the election of the participating lenders.  The Exit Financing, in the sole discretion of the Debtor, shall be used to fund Distributions and the operations of the Debtor.

2.30    "Final Order" means an order or judgment of the Bankruptcy Court in which: (i) the time for appeal or petition for review from which has expired, and no appeal or petition for review is pending or was timely filed; or (ii) any appeal or petition for review which has been finally determined or dismissed.

2.31    "GUC Distribution" means the Distribution of no less than a total of $250,000 to be paid in a single lump sum payment on the Effective Date to Holders of Class 3 Claims on a Pro Rata basis, as may be modified pursuant to Section IV of the Plan.

2.32    "Holder" means a Person that is the beneficial owner of a Claim or Interest. For purposes of a Distribution, a Person must be a Holder of an Allowed Claim as of February 1, 2024, or such later date when the Disputed Claim becomes an Allowed Claim.

2.33    "IND Lenders" means, collectively, Ascentium Capital, Direct Capital (CIT), Alliance Funding Group, and Balboa Capital who separately financed portions of the Debtor's purchase of the refrigeration system at IND and agreed for the Debtor sell the refrigeration system pursuant to the Auctioneer Motion.  The IND Lenders shall have their Claims and all Liens satisfied through the sale of their collateral outside of this Plan.  Any deficiency claim of an IND Lender shall be satisfied as a Class 3 Claim.

2.34    "Insider" means any Person who is an "insider" of the Debtor under §101(31) of the Bankruptcy Code.

275709514

2.35    "Interest" means a share in the Debtor, whether or not transferable, denominated "stock," preferred, common, or similar security.

2.36    "Interest Holder" means a Person that is the beneficial owner of an Interest in the Debtor, as of the Effective Date, and set forth on **Exhibit C**.

2.37    "Interest Rate" means the interest rate to be applied by the Bankruptcy Court to determine the present value of a Claim for all purposes for which present value determinations are required to be calculated in accordance with the Bankruptcy Code. The interest rate shall be determined by the Bankruptcy Court at the Confirmation Hearing.

2.38    "Lien" means a charge against or interest in property to secure payment of a debt or performance of an obligation.

2.39    "Local Rules" means the local rules of the Bankruptcy Court.

2.40    "Person" means an individual, corporation, limited liability company, partnership, joint venture, trust, estate and/or an incorporated association.

2.41    "Petition Date" means November 3, 2023, the date on which the Bankruptcy Case was commenced.

2.42    "Plan" means this Plan of Reorganization in its present form and as it may be amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the provisions contained herein.

2.43    "Prepetition Lenders" means those lenders under the Prepetition Loans as set forth on **Exhibit B**.

2.44    "Professional" means any Person employed by the Debtor pursuant to 11 U.S.C. § 327(a) or 327(e) and an order of the Bankruptcy Court.

2.45    "Pro Rata" means the same proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests in such Class. To the extent Disputed Claims or Disputed Interests exist in such Class, Pro Rata share shall mean until such Disputed Claims or Interests shall, in whole or in part, have become Allowed Claims or Interests, as the case may be, the same proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of all Allowed Claims and Disputed Claims and Allowed Interests and Disputed Interests, as the case may be, in such Class.

2.46    "Reorganized Debtor" means Clover Fast Food, a Delaware corporation, from and after the Effective Date operating under the terms of the confirmed Plan.

2.47    "Retained Actions" means all causes of action and Claims that are part of the Estate, and that are being transferred to the Reorganized Debtor on the Effective Date, including, without limitation, all Chapter 5 Claims, litigation assets, and all avoidance actions.

2.48    "Schedules" means the required schedules of assets and liabilities, pursuant to § 521(a) of the Bankruptcy Code and Bankruptcy Rule 1007(b), filed in the Bankruptcy Case on December 1, 2023, as Docket No. 94.

2.49    "Secured Creditor" means a Creditor who held, as of the Petition Date, an Allowed Secured Claim, including the Prepetition Lenders, DIP Lenders, ABL Lenders, and any Creditor with a valid right of setoff pursuant to § 553 of the Bankruptcy Code.

2.50    "Substantial Consummation" means the commencement of Distributions under this Plan after the Effective Date.

**ARTICLE III**

**Classification of Allowed Claims and Allowed Interests**

3.01    <u>Inclusion in Classes.</u> All Allowed Claims and Allowed Interests, other than the unclassified Allowed Claims treated under Article V of the Plan, are placed in the following Classes.

3.02    <u>Class 1 – Allowed Secured Claims.</u> Class 1 consists of the Secured Claims of the ABL Lenders, Prepetition Lenders, DIP Lenders, and claims of any other Secured Creditor. The Class 1 Claims are unimpaired under the Plan in an amount to be determined on or before the Effective Date.

3.03    <u>Class 2 – Allowed Priority Claims.</u> Class 2 consists of all Allowed Priority Claims. Class 2 Claims are unimpaired under the Plan.

3.04    <u>Class 3 – Allowed General Unsecured Claims.</u> Class 3 consists of all Allowed General Unsecured Claims. Holders of Class 3 Claims are impaired under the Plan.

3.05    <u>Class 4 – Interests in Debtor.</u> Class 4 consists of the ownership Interests in the Debtor as they existed on the Petition Date and, upon the Effective Date, the Allowed Interests of the Reorganized Debtor.  The Holders of Class 4 Interests are set forth on **Exhibit C** as listed on the Debtor's schedules.  Holders of Class 4 Interests are unimpaired under the Plan.

**ARTICLE IV**

**Treatment of Classified Claims**

4.01    <u>Plan Treatment Summary.</u> As detailed in Article III, the Plan divides Allowed Claims and Allowed Interests against the Debtor into various Classes which the Debtor believes are in accordance with the classification requirements under the Bankruptcy Code. Distributions to the Holders of Allowed Claims under the Plan are in full satisfaction of those Allowed Claims

275709514

(including any interest accrued and allowable thereon). The treatment of classified Allowed Claims and Allowed Interests under the Plan is set forth below.

4.02    Treatment of Class 1 Claim.    The Class 1 Claims shall receive the following treatment:

(a)    ABL Lenders.    The ABL Lenders are unimpaired.  The Debtor shall continue to perform all obligations under the respective loans of the ABL Lenders and cure any defaults on or before the Effective Date.

(b)    Prepetition Lenders/DIP Lenders.    The *pari passu* loans of the Prepetition Lenders and DIP Lenders shall be rolled-up and become part of the Exit Financing pursuant to the Exit Financing documents to be filed prior to the Objection Deadline.

4.03    Treatment of Class 2 Priority Claims.    The Debtor shall pay all Class 2 Priority Claims, pursuant to 11 U.S.C. §§ 507(a)(8) and 1129(a)(9)(C), in full, on the Effective Date.

4.04    Treatment of Class 3 General Unsecured Claims. Class 3 shall consist of all Allowed General Unsecured Claims not otherwise classified.  Except as set forth in Section 10.01 of this Plan, the GUC Distribution of $250,000, in total, shall be paid to Holders of Allowed Class 3 Claims on a Pro Rata basis on the Effective Date.

The liquidation analysis, attached hereto as **Exhibit E**, demonstrates that if the Bankruptcy Case was converted to a case under Chapter 7 of the Bankruptcy Code, the Holders of Allowed Class 3 Claims would *not* receive a Distribution and all Distributions would be made only to the Secured Creditors.  A conversion to Chapter 7 would cause the immediate cessation of business operations, loss of hundreds of jobs, diminution of all value, and inability to pay unsecured creditors anything.  The Debtor's Plan proposes to pay the general unsecured creditors $250,000 on a Pro Rata basis immediately on the Effective Date.

4.05   <u>Treatment of Class 4 Interests.</u> Class 4 consists of the ownership Interests in the Debtor as they existed on the Petition Date and, upon the Effective Date, shall consist of the Allowed Interests of the Reorganized Debtor.

## **ARTICLE V**

### **Treatment of Unclassified Allowed Claims**

In accordance with §§ 1123(a)(1) and 1129(a)(12) of the Bankruptcy Code, Allowed Claims of the kind described in §§ 507(a)(1), 507(a)(2) and 507(a)(8) of the Bankruptcy Code are unclassified under the Plan and are treated in the manner set forth below.

5.01   <u>Administrative Expense Claims.</u> Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code will be paid in full no later than the Effective Date, in cash, or upon such other terms as may be agreed upon by the Holder of an Administrative Expense Claim and the Debtor.  **The deadline for the Holders of Administrative Expense Claims (including any Governmental Unit), other than those of Professionals and the Subchapter V Trustee Fees, to file a request for payment thereof in the Bankruptcy Case is thirty (30) days following the Effective Date.**

5.02   <u>Subchapter V Trustee Fees.</u> The Subchapter V Trustee's fees will be paid pursuant to § 330(a) of the Code, without regard to the limitations set forth in § 326(a) of the Code (the "**Subchapter V Trustee Fees**"). The Subchapter V Trustee Fees will accrue and be timely paid until the Bankruptcy Case is closed, dismissed, or converted to another chapter of the Bankruptcy Code. Any Subchapter V Trustee Fees owed on or before the Effective Date of the Plan will be paid on or before the Effective Date or such date as the Subchapter V Trustee Fees are approved by the Bankruptcy Court.

5.03    Priority Tax Claims. Each holder of a priority claim allowed under § 507(a)(8) of the Bankruptcy Code ("Priority Tax Claim") will be paid in full, in cash, on the later of: (i) the Effective Date, (ii) 30 days after the Priority Tax Claim is filed if filed after the Effective Date but prior to the Governmental Claim Bar Date, or (iii) upon such other terms as may be agreed upon by the Holder of a Priority Tax Claim and the Debtor. **The deadline for the Holders of a Priority Tax Claim to file a claim shall be the Governmental Claim Bar Date.**

## ARTICLE VI

### Allowance and Disallowance of Claims and Deadlines

6.01    Unsecured Claims. The deadline for non-governmental Creditors to file a Proof of Claim was January 2, 2024.  The deadline for governmental Creditors to file a Proof of Claim is May 1, 2024 (the "Governmental Claim Bar Date").

6.02    Administrative Expense Claim Deadline. Except as set forth in Section 10.02 of this Plan, the deadline for the Holders of Administrative Expense Claims (including Governmental Units), other than those of Professionals and the Subchapter V Trustee Fees, to file a request for payment thereof in the Bankruptcy Case is thirty (30) days following the Effective Date.

6.03    Claim Objection Deadline. Subject to any prior orders entered in the Bankruptcy Case, **the Debtor shall have 120 days after the Effective Date or 120 days after a Proof of Claim has been filed, whichever is later, to file an objection to any Claim**. Each deadline may be extended, without limitation, upon motion to the Bankruptcy Court.  For the avoidance of doubt, the Debtor shall not pay any Disputed Claim subject to a possible objection on the Effective Date and the Debtor shall set aside a reserve amount equal to each Disputed Claim pending Final Order from the Bankruptcy Court.

# ARTICLE VII

## Executory Contracts and Unexpired Leases

7.01    Upon the Effective Date, the Debtor will assume the following unexpired leases of

non-residential real property:

| | Lessor | Lease / Contract | Cure Amount |
|---|---|---|---|
| (a) | 160 Federal Owner LLC (FIN) | Lease for premises at 160 Federal Street Boston, MA | $0.00[1] |
| | | | |
| (b) | BP Five CC LLC (KND) | Lease for premises at: 5 Cambridge Center Cambridge, MA | N/A[2] |
| | | | |
| (c) | BP Prucenter Acquisition LLC  (PRU) | Lease for premises at: 800 Boylston Street #15 Boston, MA | $16,025.85 |
| | | | |
| (d) | Central Property Management LLC  (HFI) | Lease for premises at: 494-496 Massachusetts Ave. Cambridge, MA | $6,968.96 |
| | | | |
| (e) | Fernando L. Laranjera Realty Trust  (HUB) | Lease for premises at: 1075-1079 Cambridge Street Cambridge, MA | $18,566.01[3] |
| | | | |
| (f) | Knickerbocker Longwood LLC  (LMA) | Lease for premises at: 360 Longwood Ave. Boston, MA | $31,385.59 |
| | | | |
| (g) | Linear Retail Burlington #1 LLC  (BUR) | Lease for premises at: 68-82 Burlington Mall Road Burlington, MA | $13,533.00 |
| | | | |

---

[1] The lease for FIN shall be amended and assumed pursuant to a lease amendment between 160 Federal Owner LLC, as landlord, and the Debtor, as tenant, that maintains reduced monthly rent, permits the setoff of the security deposit to cure all arrears, and terminates the lease effective December 31, 2024.

[2] The lease for KND – 5 Cambridge Center, Cambridge MA – has been assumed pursuant to the entered agreed order approving the assumption of the KND lease to and including October 31, 2024.

[3] The assumption of the HUB lease will permit all parties to retain their rights without any waiver of arguments related to any purported future rent increases under the lease.

275709514

| (h) | NS 27 School LLC (DTX) | Lease for premises at: 25-27 School Street, Boston, MA | $71,810.99[4] |
| | | | |
| (i) | President and Fellows of Harvard College  (HSC) | Lease for premises at: 1 Oxford Street Cambridge, MA | $0.00 |
| | | | |
| (j) | President and Fellows of Harvard College  (HSQ) | Lease for premises at: 1326 Massachusetts Ave. Cambridge, MA | $12,555.17[5] |
| | | | |
| (k) | Washington Place Owner LLC  (NTV) | Lease for premises at: 835 Washington Street Newton, MA | $13,634.63 |
| | | | |
| (l) | Whole Foods Market Group, Inc. | Supplier license agreement for premises at: 536 Boston Post Road Sudbury, MA | $464.18 |
| | | | |
| (m) | Whole Foods Market Group, Inc. | Supplier license agreement for premises at: 160 Littleton Rd. Westford, MA | $614.63 |

7.02    Upon the Effective Date, the Debtor will assume the following executory contracts and unexpired leases (other than non-residential real property):

| | Counterparty | Lease / Contract | Cure Amount |
|---|---|---|---|
| (a) | Antares Group Inc. | Consulting Contract | $0.00 |
| | | | |
| (b) | Antares Group Inc. | Software Contract | $0.00 |
| | | | |

---

[4] NS 27 School LLC, as landlord, and the Debtor, as tenant (collectively, the "**DTX Parties**"), to the DTX lease (the "**DTX Lease**") continue to negotiate the terms of an amendment to the DTX Lease.  The DTX Parties anticipate finalizing a lease amendment prior to the Confirmation Hearing; however, the DTX Parties reserve all rights to the assumption and/or rejection of the DTX Lease pending entry into an amendment to the DTX Lease.

[5] The lease for HSQ and cure amount have been resolved through the *Third Amendment to Lease* between President and Fellows of Harvard College, as landlord, and Debtor, as tenant (collectively, the "**HSQ Parties**"), attached hereto as **Exhibit G** and to be assumed pursuant to the Confirmation Order.  The HSQ Parties reserve all rights with respect to the HSQ lease and *Third Amendment to Lease* pending entry of the Confirmation Order.

275709514

| (c) | Heroku | Main Services Agreement | $332.56 |
|-----|--------|------------------------|---------|
|     |        |                        |         |
| (d) | LFT Joy Street LLC | Parking Spaces | $1,500.00 |
|     |        |                        |         |
| (e) | NBM | Lease agreement for professional grade printer | $791.83 |
|     |        |                        |         |
| (f) | NBM | Equipment Maintenance Contract | N/A (Above) |
|     |        |                        |         |

7.03    All other unexpired leases and executory contracts not listed above in Section 7.01 or 7.02 or not previously assumed or rejected shall be deemed rejected.  The terms of all orders entered in the Bankruptcy Case providing for the assumption or rejection of any executory contracts and unexpired leases shall continue in full force and effect notwithstanding confirmation of the Plan or any discharge of the Debtor.  **The deadline for any counterparty to an executory contract or unexpired lease rejected pursuant to this Section 7.03 to file a proof of claim shall be 30 days after the Effective Date.**

## ARTICLE VIII

### Implementation of the Plan

8.01    <u>General.</u> After the Effective Date, the Reorganized Debtor intends to continue its operations indefinitely, and under no circumstances for a period shorter than that which is necessary for its repayment of all Allowed Claims as prescribed the Plan.

8.02    <u>Authorization.</u> The Debtor and Reorganized Debtor will be authorized and directed to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.

8.03    <u>Source of Funding of Distributions.</u> The Plan will be funded with cash on hand, future operating revenue, and the Exit Financing.  The Plan is feasible, pursuant to § 1129(a)(11)

275709514

of the Bankruptcy Code, based on the projected income of the Debtor over the term of the Plan. The Exit Financing will be available on the Effective Date for the Debtor to utilize, as necessary, to warrant the feasibility of the Plan.

The Debtor's financial projections are attached hereto as **Exhibit F**.  Based on these projections, to ensure the continued operations of the Debtor and no further reorganization is required, the Debtor has formulated this Plan to maximize the Distributions to Creditors while minimizing the harm to future operations.  The success of this Plan is predicated on the continued operation of the Debtor and provision of the Exit Financing from the Prepetition Lenders and DIP Lenders.  The projections attached hereto demonstrate the feasibility of the Plan and likelihood of success.

8.04    Corporate Action. Each of the matters provided for in the Plan involving the corporate structure of the Reorganized Debtor or corporate action to be taken or required of the Reorganized Debtor, shall, as of the Effective Date, be deemed to have occurred, approved, authorized, and shall be effective as provided under the Plan without the requirement of any further action of any kind by the shareholders, directors, officers, members, managers, or board of the Reorganized Debtor or any affiliate thereof.

8.05    Compliance with Tax requirements. In connection with the Plan, the Reorganized Debtor will comply with any withholding and reporting requirements imposed by federal, state, and local taxing authorities, and Distributions will be subject to the withholding and reporting requirements.

8.06    Post-Confirmation Management and Compensation.   Pursuant to 11 U.S.C. § 1129(a)(5) the title and compensation for all "insiders" of the Debtor as of the hearing on confirmation of the Plan are as follows:

| Name | Title | Salary as of 11/3/2023 | Salary as of 3/14/2024 |
|------|-------|------------------------|------------------------|
| Julia Wrin Piper | Chief Executive Officer | $180,000.00 | $180,000.00 |

The compensation for all "insiders," as of the Effective Date, shall not exceed such compensation set forth above as of March 14, 2024.

8.07    Powers and Duties of the Reorganized Debtor to Implement the Plan. From and after the Effective Date, the Reorganized Debtor shall implement the Plan, fulfilling its duties and obligations and exercising its rights and powers under the Plan and conducting any activity consistent with the Plan and orders entered in by the Court and shall do so without further action, consent or approval of its board, officers, or managers, and in connection therewith shall be vested with authority and responsibility for, among other things:

(a)    Prosecuting the Retained Actions for the benefit of parties in interest, including reviewing, objecting to, negotiating, settling, or otherwise compromising any Retained Action;

(b)    Executing agreements, instruments, and other documents;

(c)    Objecting to and resolving Disputed Claims;

(d)    Making Distributions and paying expenses of administering the Plan;

(e)    Employing and compensating professionals;

(f)    Exercising the rights, power, and authority of the Reorganized Debtor under applicable provisions of the Plan and bankruptcy and non-bankruptcy law;

(g)    Filing all tax returns when due including all tax returns necessary to close the Estate;

(h)    Preparing and filing any periodic reports required by the Bankruptcy Court or under the Bankruptcy Code, the Bankruptcy Rules, or the Plan;

(i)    Furnishing such information regarding administration of the Plan as may be requested by parties in interest unless otherwise ordered by the Bankruptcy Court; and

(j)    Closing the Case.

8.08    <u>Distributions to Holders of Allowed Claims.</u> Distributions shall be mailed, *via* first class mail, to the Creditor's address: (a) listed on the proof of claim, (b) such other address as provided by the Creditor before the Distribution is mailed, or (c) if 8.08(a)-(b) are not available, the address listed on the Debtor's schedules.

8.09    <u>Unclaimed Distributions.</u> All Distributions which remain uncashed for 180 days shall be void and deemed forfeited. The Reorganized Debtor shall not be liable for or obligated to pay any forfeited Distributions.

8.10    <u>Post-Confirmation Transactions.</u> Except as set forth in Section 10.03 of this Plan, nothing in the Plan or the Bankruptcy Code shall impair or prevent the Reorganized Debtor from entering into a financing transaction, merging with another entity, selling substantially all of its assets or otherwise engaging in a transaction that further restructures the Reorganized Debtor (a "**Post-Confirmation Transaction**") without any further authorization from the Court or any other Person, provided that the Reorganized Debtor or the Person that engages in a Post-Confirmation Transaction with the Reorganized Debtor, as applicable, shall be obligated to perform the Reorganized Debtor's obligations under the Plan.

8.11    <u>Post-Confirmation Professionals.</u> Except as set forth in Section 10.04 of this Plan, the Reorganized Debtor may retain such personnel or professionals (including, without limitation, legal counsel, financial advisors, or other agents) as it deems appropriate, and compensate such professionals without approval of the Bankruptcy Court. Professionals so retained need not be "disinterested" as that term is defined in the Bankruptcy Code. Professionals so retained also need

not make any disclosures pursuant to Bankruptcy Rules 2014 and 2016. Notwithstanding the foregoing, Professionals retained by the Debtor in the Bankruptcy Case shall be entitled to compensation for services rendered prior to the Effective Date only in accordance with §§ 330 and 331 of the Code and any applicable Bankruptcy Rules or Local Rules.

8.12    <u>Post-Confirmation Discharge of Subchapter V Trustee.</u> If this Plan is confirmed under § 1191(a) of the Bankruptcy Code, then upon Substantial Consummation of this Plan, the Subchapter V Trustee's services shall be terminated. If the Plan is confirmed under § 1191(b) of the Bankruptcy Code, then the Subchapter V Trustee shall remain appointed and charged with making all distributions to Holders of Class 3 Claims, until all such payments have been completed and the Subchapter V Trustee is discharged by the Bankruptcy Court.

8.13    <u>Vesting and Transfer of Assets to the Reorganized Debtor.</u> Except as set forth in Section 10.05 of this Plan, pursuant to § 1141(c) of the Bankruptcy Code, and except as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, all Assets shall vest in the Reorganized Debtor free and clear of all liens, Claims, encumbrances, and interests.

8.14    <u>Retention of all Causes of Action, Defenses, and Counterclaims.</u> Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with § 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Retained Actions are assigned and transferred to the Reorganized Debtor. Thereafter, the Reorganized Debtor is authorized to investigate, prosecute, settle, and compromise any Retained Action. The Reorganized Debtor may, in its sole discretion, pursue or refrain from pursuing the Retained Actions, as appropriate. For the avoidance of doubt, the Debtor does not intend to waive or release any Claims held by the Estate and shall not waive or release any Claims by failing to identify them in the Plan. The Reorganized Debtor also retains and may

275709514

prosecute and enforce all defenses, counterclaims, and rights against or with respect to all Claims asserted against the Debtor, the Estate, or the Reorganized Debtor.

8.15   <u>Standing.</u> From and after the Effective Date and continuing through the date on which a Final Order closing the Bankruptcy Case is entered pursuant to § 350 of the Bankruptcy Code and Bankruptcy Rule 3022 (or, if the Bankruptcy Case is re-opened, the date on which it is closed again), the Reorganized Debtor shall possess the rights of a party in interest pursuant to § 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to this Bankruptcy Case or the Reorganized Debtor.

8.16   <u>Setoffs.</u> The Debtor or, after the Effective Date, the Reorganized Debtor, may set off against any Claim, and any Distributions to be made pursuant to the Plan on account of such Claim, Claims of any nature whatsoever that the Debtor may have or have had against the Holder of the Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtor or Reorganized Debtor of any Claim that the Debtor or Reorganized Debtor may have against the Holder.

8.17   <u>Reservation of Rights.</u> The Debtor and the Reorganized Debtor have, retain, reserve, and are entitled to assert all such Claims, causes of action, rights of setoff and other legal or equitable defenses that the Debtor had prior to the Petition Date as if the Bankruptcy Case had not been commenced. All of the Debtor's legal and equitable rights respecting any Claim may be asserted after the Effective Date to the same extent as if the Bankruptcy Case had not been commenced.

275709514

## ARTICLE IX

## Effect of Confirmation

9.01    <u>Terms Binding.</u> Upon the Effective Date, all provisions of the Plan, and all amendments, exhibits and schedules thereto, shall become binding on the Reorganized Debtor, the Estate, all Creditors, Interest Holders, and all other Persons whose interests are affected in any way by the Plan.

9.02    <u>Confirmation Under § 1191(a).</u> If this Plan is confirmed under § 1191(a) of the Bankruptcy Code, as of the Effective Date, the Reorganized Debtor will be discharged from any debt that arose before the Confirmation Date, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, except that the Reorganized Debtor will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided in § 1141(d)(6) of the Bankruptcy Code.

9.03    <u>Confirmation Under § 1191(b).</u> If this Plan is confirmed under § 1191(b) of the Bankruptcy Code, the Reorganized Debtor will not be discharged from any debt, whether arising prior to the Petition Date, after the Petition Date, or as imposed by this Plan, until the Court discharges the Reorganized Debtor upon its completion of all payments set forth in Section 10.01 of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code. The Reorganized Debtor will not be discharged from any debt on which the last payment is due after the first 5 years of the Plan, or as otherwise provided in § 1192 of the Bankruptcy Code.

9.04    <u>Jurisdiction of the Bankruptcy Court.</u> After the entry of the Confirmation Order, the Bankruptcy Court will retain jurisdiction for the following purposes:

(a)    To determine the classification and priority of all Claims against the Debtor and to re-examine any Claims which may have been allowed;

(b)    To determine allowance of Claims for damages with respect to rejection of

36

any such executory contracts or unexpired leases within such time as the Bankruptcy Court may direct;

(c)     To hear and determine all applications for compensation and other administrative expenses;

(d)     To hear and determine all Chapter 5 Claims;

(e)     To conduct hearings on valuation, as necessary, and to determine whether any party-in-interest is entitled to recover any Claim against any Person, whether arising under § 506(c) of the Bankruptcy Code, or arising out of a voidable preference, a fraudulent transfer, or otherwise;

(f)     To hear and determine any and all adversary proceedings or contested matters;

(g)     To determine any modification of the Plan after Confirmation pursuant to § 1193 of the Bankruptcy Code;

(h)     To determine all matters, controversies and disputes arising under or in connection with the Plan or otherwise related to the application, or disposition of the Estate Property;

(i)     To enter any order, including injunctions, necessary to establish and enforce the rights and powers of the Debtor under the confirmed Plan;

(j)     To ensure that the Reorganized Debtor complies with the provisions of the Plan and with all orders of the Bankruptcy Court pursuant to the Plan;

(k)     To enable the Reorganized Debtor to take all actions contemplated by the Plan;

(l)      To adjudicate all claims or controversies arising out of any purchases, sales, or contracts made or undertaken by the Debtor or the Reorganized Debtor during the pendency of this Chapter 11 where the outcome of that proceeding could conceivably have any effect on the Estate being administered during the Case;

(m)      To enter a Final Order pursuant to Rule 3022 of the Bankruptcy Rules; and

(n)      For all other valid purposes as set forth under title 11 and 28 of the United States Code.

9.05      <u>The Exit Financing</u>.  The Exit Financing rolls-up the existing Prepetition Loans and DIP financing while extending an additional $1,000,000 in new financing for the Debtor.  The Exit Financing, at the discretion of the Debtor, shall be used to fund Distributions and supplemental revenue for operations.  The Exit Financing may convert to preferred equity at a future date in connection with a subsequent financing of the company meeting certain criteria or at the election of the participating lenders following the maturity date of the Exit Financing.  The documentation for the Exit Financing shall be filed with the Court prior to Confirmation Hearing.

9.06      <u>Exculpation.</u>  On the Effective Date, none of the Debtor, Reorganized Debtor, the officers and directors of the Debtor acting in such capacity during the Bankruptcy Case, Professionals for the Debtor employed pursuant to § 327 of the Bankruptcy Code, or Subchapter V Trustee (each, an "<u>Exculpated Party</u>"), shall have or incur any liability for any act or omission in connection with, relating to or arising out of the Bankruptcy Case, the formulation, negotiation, confirmation or consummation of this Plan or any contract, instrument, release or other agreement or document entered into for the period from the Petition Date to and including the Effective Date of this Plan; provided, however, that nothing in Section 9.06 of this Plan shall be construed to

38

release or exculpate any Exculpated Party from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

## ARTICLE X

### Cramdown Plan of Reorganization

10.01   Treatment of Class 3 General Unsecured Claims.  In the event the Holders of Class 3 Claims do not vote to accept the Plan, the Debtor will seek to confirm the Plan pursuant to 11 U.S.C. § 1191(b).  If the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), the Holders of Allowed Class 3 Claims shall receive, on a *pro rata* basis, all of the "projected disposable income" (as defined in 11 U.S.C. § 1191(d)(2)) of the Debtor to be received in the five (5) year period beginning on the Effective Date.  **The Debtor does not currently project to have any disposable income until 2027 as defined under 11 U.S.C. § 1191(d)(2) without the Exit Financing**.  The payments to Holders of Allowed Class 3 Claims, under a Plan confirmed pursuant to 11 U.S.C. § 1191(b) (if any), shall commence on October 1, 2026, and then on the first day of each subsequent quarter thereafter, and ending on January 1, 2028.

10.02   Administrative Expense Claims. If the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), the deadline for the Holders of Administrative Expense Claims shall be February 3, 2028, which is thirty (30) days following the completion of all payments set forth in Section 10.01 of this Plan.

10.03   Post-Confirmation Transaction.  If the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), under 11 U.S.C. § 363(b), the Debtor shall not use, sell, lease, or otherwise transfer property of the bankruptcy estate, other than in the ordinary course of business, except after notice and a hearing before the Bankruptcy Court.

10.04  <u>Post-Confirmation Professionals</u>.  If the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), any professional to be employed by the Debtor will need to be employed pursuant to 11 U.S.C. § 327, including, without limitation, the requirement to remain disinterested, and shall be compensated pursuant to sections 330 and 331 of the Bankruptcy Code, any applicable Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the District of Delaware, the Guidelines established by the U.S. Trustee, and any procedures as further established by order of the Court.

10.05  <u>Vesting and Transfer of Assets to the Reorganized Debtor</u>.  If the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), all property of the Debtor shall remain part of the Debtor's bankruptcy estate and shall not revest with the Debtor, as a Reorganized Debtor, until all payments under Section 10.01 of this Plan are completed and the Subchapter V Trustee is discharged.

10.06  <u>Terms of Injunctions or Stay</u>.  If the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), all injunctions provided for in the Bankruptcy Case under Section 105 or 362 of the Bankruptcy Code or otherwise, and existing on the Confirmation Date shall continue in full force and effect until the Debtor completes all payments set forth in Section 10.01 of the Plan and receives its discharge.

## **ARTICLE XI**

### **General Provisions**

11.01  <u>Integration Clause.</u> The Plan constitutes a complete, whole, and integrated statement of the binding agreement among the Debtor, each of the Creditors, claimants, parties-in-interest, Holders of Allowed Claims, and Holders of Allowed Interests, their respective successors and assigns, and other parties in interest upon the matters herein. Parol evidence shall not be admissible in an action regarding the Plan or any of its provisions.

275709514

11.02   Binding effect. The rights, duties, and obligations of any Person named or referred to in the Plan shall be binding upon and shall inure to the benefit of such Person and his, her, or its respective successors and assigns.

11.03   Severability. If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable before the Confirmation Date, the Bankruptcy Court, at the request of the Debtor, will have the power to alter and interpret the term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and the term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by the holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

11.04   Modification of Plan. Pursuant to § 1193(a) of the Bankruptcy Code, the Debtor may modify the Plan at any time prior to the entry of the Confirmation Order. After entry of the Confirmation Order, the Reorganized Debtor may, pursuant to §§ 1193(b) and (c) of the Bankruptcy Code or Bankruptcy Rule 3019, and with approval of the Bankruptcy Court, modify or amend the Plan in a manner which does not materially or adversely affect the interests of Persons affected by the Plan, without having to solicit acceptance of such modifications, and may take such steps as are necessary to carry out the purpose and effect of the Plan as modified.

11.05   Withdrawal or Revocation of the Plan. The Debtor may withdraw or revoke the Plan at any time before the Confirmation Date, or thereafter prior to the Effective Date.

275709514

11.06   <u>Effect of Withdrawal or Revocation of the Plan.</u> If the Debtor revokes or withdraws the Plan before the Confirmation Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan will be null and void. In such event, nothing contained in the Plan will be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person, or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

11.07   <u>Asserting and Curing Defaults under the Plan.</u> If the Debtor or Reorganized Debtor defaults under the provisions of the Plan, any Creditor or Holder wishing to assert a default shall provide the Reorganized Debtor with written notice of the alleged default. The Reorganized Debtor shall have 30 days from receipt of written notice to cure any alleged default.

11.08   <u>Further Actions.</u> Pursuant to § 1142(b), the Confirmation Order shall operate as an order of the Bankruptcy Court directing the Reorganized Debtor, and any other party to execute and deliver, as necessary, any instrument required to effect a transfer of the Estate Property, and to perform any other act that is necessary for the consummation of the Plan.

11.09   <u>Term of Injunctions or Stays.</u> All injunctions or stays provided for in the Bankruptcy Case under §§ 105 or 362 of the Bankruptcy Code or otherwise, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), will remain in full force and effect until the Effective Date unless otherwise provided herein or in the Confirmation Order.

11.10   <u>Governing Law.</u> Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Delaware govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, and any corporate governance matters arising

275709514

under state law with respect to the Debtor, without giving effect to the principles of conflicts of law thereto.

11.11   Computation of Time Periods. If any date or deadline established under the Plan falls on a day that is not a Business Day, the date or deadline is the next Business Day after such day. The provisions of Bankruptcy Rule 9006(a) otherwise govern the computation of any applicable time period under the Plan.

11.12   Due Authorization. Each and every Holder of an Allowed Claim who elects to participate in the Distributions provided for in the Plan warrants that it is authorized to accept the Distributions provided for in the Plan in consideration of such Allowed Claim and that there are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by it under the Plan.

11.13   Offer of Compromise. The terms and conditions embodied in the Plan shall not be deemed to be an admission of liability of the Debtor or any other Person, and are not admissible by or against the Debtor or the Reorganized Debtor in any proceeding or action, other than one to enforce the provisions of the Plan.

11.14   Headings and Captions. The headings and captions in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

11.15   Notices. All notices in connection with the Plan, including any notices concerning a change of address, should be delivered by overnight mail or United States certified mail, postage prepaid, return-receipt requested, at the following addresses:

> CLARK HILL PLC
> Attn: Kevin H. Morse
> 130 East Randolph Street | Suite 3900
> Chicago, Illinois 60601
> T: (312) 985-5556
> kmorse@clarkhill.com

275709514

11.16   <u>Closing of the Case.</u> After the Estate has been fully administered, the Debtor shall

move for the entry of a Final Order and close the Bankruptcy Case in accordance with § 350 of

the Bankruptcy Code.

Dated: March 6, 2024                       Respectfully submitted,

                                           **CLARK HILL PLC**

                                           <u>*/s/ Karen M. Grivner*</u>
                                           Karen M. Grivner (Bar No. 4372)
                                           824 N. Market Street, Suite 710
                                           Wilmington, DE 19801
                                           Telephone: (302) 250-4750
                                           kgrivner@clarkhill.com
                                           - and -
                                           Kevin H. Morse (admitted *pro hac vice*)
                                           IL Bar No. 6297244
                                           Joseph A. Archambeau (admitted *pro hac vice*)
                                           IL Bar No. 6343711
                                           130 E. Randolph Street, Suite 3900
                                           Chicago, IL 60601
                                           Telephone: (312) 985-5556
                                           kmorse@clarkhill.com
                                           jarchambeau@clarkhill.com
                                           *Counsel for Clover Fast Food, Inc.*
                                           – and –

Dated: March 6, 2024                       **CLOVER FAST FOOD, INC.**

                                           <u>*/s/ Julia Wrin Piper*</u>
                                           Julia Wrin Piper
                                           Chief Executive Officer
                                           Clover Fast Food, Inc.

275709514

# **EXHIBIT A**

**Ballot**

i

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) Subchapter V |
| CLOVER FAST FOOD, INC., | ) |
| | ) Case No. 23-11812 (BLS) |
| Debtor. | ) |
| | ) **Confirmation Hearing Set for:** |
| | ) **March 14, 2024 at 10:00 a.m. (ET)** |
| | ) |
| | ) **Voting Deadline:** |
| | ) **March 1, 2024 at 5:00 p.m. (ET)** |
| | ) |

## BALLOT FOR ACCEPTING OR REJECTING
## CHAPTER 11 PLAN OF CLOVER FAST FOOD, INC.

### CLASS 3: GENERAL UNSECURED CLAIMS
### AGAINST CLOVER FAST FOOD, INC.

---

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE DEBTOR AND SUBCHAPTER V TRUSTEE ON OR BEFORE MARCH 1, 2024 AT 5:00 P.M. (PREVAILING EASTERN TIME TIME) (THE "VOTING DEADLINE")**

---

Clover Fast Food, Inc., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor") is soliciting votes with respect to its *Chapter 11 Plan of Reorganization* dated February 1, 2024 [Docket No. ___] (as may be amended, modified or supplemented from time to time, the "Plan").

Please use this Ballot to cast your vote to accept or reject the Plan if you are, as of March 1, 2024 (the "Voting Record Date"), a holder of an Allowed General Unsecured Claim in Class 3.

The Plan provides information to assist you in deciding whether to accept or reject the Plan. If you do not have a copy of the Plan, you may obtain a copy from Debtor's counsel, Clark Hill PLC, free of charge, by submitting an explicit, written request to Debtor's counsel the address set forth below.

The Plan can be confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and thereby made binding on you if it is accepted by the holders of (i) at least two-thirds in amount of the allowed Claims or Interests voted in each Impaired Class, and (ii) if the Impaired Class is a class of Claims, more than one-half in number of the allowed Claims voted in each Impaired Class, and if the Plan otherwise satisfies the

applicable requirements of section 1129(a) under the Bankruptcy Code.   If the requisite acceptances are not obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (y) does not unfairly discriminate against, the Class or Classes rejecting the Plan and (z) otherwise satisfies the requirements of sections 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or if you vote to reject the Plan. To have your vote counted, you must complete, sign, and return this Ballot to Debtor's counsel by the Voting Deadline at the following address:

| If by standard or overnight mail or hand delivery: | If by e-mail |
|---|---|
| Kevin H. Morse<br>Clark Hill PLC<br>130 E. Randolph Street, Suite 3900<br>Chicago, Illinois 60601 | kmorse@clarkhill.com |

Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 3 Unsecured Claims. You must provide all of the information requested by this Ballot. Failure to do so may result in the disqualification of your vote.

**PLEASE READ THE ATTACHED VOTING INFORMATION AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

**Item 1. Amount of Claims.** The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the holder (or authorized signatory of such a holder) of **Class 3 – General Unsecured Claims against Clover Fast Food, Inc.** in the amount set forth below.

| $ |
|---|

**Item 2. Votes on the Plan.** Please vote either to accept or to reject the Plan with respect to your Claim below. Any Ballot not marked either to accept or reject the Plan, or marked both to accept and reject the Plan, shall not be counted in determining acceptance or rejection of the Plan.

The undersigned holder of a Class 3 General Unsecured Claim against Clover Fast Food, Inc. votes to (check one box):

☐  **Accept** the Plan             ☐  **Reject** the Plan

2

**Item 3. Acknowledgments.** By signing this Ballot, the Holder (or authorized signatory of such Holder) acknowledges receipt of the Plan and the other applicable solicitation materials, and certifies that (i) it has the power and authority to vote to accept or reject the Plan, (ii) it was the Holder (or is entitled to vote on behalf of such Holder) of the General Unsecured Claim(s) (Other Than Unsecured Notes) described in Item 1 as of the Voting Record Date, and (iii) all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned hereunder, shall be binding on the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy, and legal representatives of the undersigned, and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

Print or Type Name of Claimant: _____

Signature: _____

Name of Signatory (if different than Claimant): _____

If by Authorized Agent, Title of Agent: _____

Street Address: _____

City, State, and Zip Code: _____

Telephone Number: _____

E-mail Address: _____

Date Completed: _____

3

**EXHIBIT B**

**List of Lenders**

275709514

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re Clover Fast Food, Inc.           Chapter 11           Case No. 23-11812 (BLS)

### LIST OF SPECIAL LENDERS

### ABL Lenders

- Ally Financial
- Blue Bridge Financial LLC
- Channel Partners Capital LLC
- Crestmark
- Fidelity Capital Partners LLC
- M2 Equipment Finance
- Mercedes-Benz Financial Services
- Navitas Credit Corp.
- NewLane Finance Company

### Prepetition Lenders

- Blue58 LLC
- Little Harbour SAZ, LLC
- Jalka Realty LLC
- Snowbank LLC
- Burning Suit LLC
- G-K Family LLC
- Germeshausen Foundation

### DIP Lenders

- Blue58 LLC
- Little Harbour SAZ, LLC

# **EXHIBIT C**

## **List of Interest Holders**

275709514

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re Clover Fast Food, Inc.                    Chapter 11                    Case No. 23-11812 (BLS)

## LIST OF EQUITY HOLDERS

- Alex Kazaks
- Anat Group Limited
- Beta5 LLC
- Blue58 LLC
- Cero Ventures LLC
- Charles D. Atkinson III
- Connon Trust
- Dan Heath
- Dennis F. Ratner Revocable Declaration of Trust
- Desert Bloom Inc.
- Eric Graber-Lopez
- Ethan Sherbondy
- Fribourg Enterprises LLC
- Gates 2010 Irrevocable Trust
- G-K Family LLC
- Herb Singh and Sheila Singh

- Jeremiah Shafir
- John Bult
- Little Harbour SAZ LLC

- Manju Jhawar, Priya Jhawar and Sheila Singh
- Mark Ordan
- Michael Crooke & Amy M. Dozier
- New September LLC, a California Limited Liability Company
- Oz Garinkol
- RiverRoad Associates

- Semillero Investment Fund II LP
- Snowbank LLC
- Stonegate Capital Holdings LLC
- SV Tech Holdings LLC
- Walter Robb 2015 Family Trust
- Wildwood Investments LLC

- Anand Gala
- Ayr Muir
- Blair Crawford
- Burning Suit LLC
- Charles Collins
- Chris Weilminster
- Dan Goldman
- Darshan Shah and Priya Jhawar
- Desert Bloom Food Ventures LLC
- Ed Mathias
- Erik Joule
- FranInvest LLC
- Gates 2004 Irrevocable Trust
- Germeshausen Foundation Inc.
- Gregory Donoghue
- James R. Gates Separate Property Revocable Trust
- Jim Manzi
- Lerner Group Investments
- Madeline Benjamin Investments LLC
- Manzi 1993 Irrevocable Trust

- Michael Crooke
- New September LLC
- O'Neill Investments Fund One LLC
- Pritesh Shah
- Ronald M. Shaich 2000 Revocable Trust
- SMJ Partners II LLC
- Sota Partners LLC
- Stonegate Capital LLC
- Third Nature Ventures LP
- Wes Jabonski

## **EXHIBIT D**

**Exit Financing**

# Clover Fast Food, Inc.

## SUMMARY OF TERMS FOR

## DIP FINANCING ROLL-UP

**Background:**

| | |
|---|---|
| **Issuer:** | Clover Fast Food, Inc. (the "<u>Company</u>"). |
| **Amount; Conversion:** | Existing lenders of the Company have funded or committed an aggregate amount of approximately $2.7 million in pre-petition and debtor-in-possession financing to the Company, documented by non-convertible secured promissory notes (the "<u>Existing Indebtedness</u>"). |

The Company requires an additional $1 million in capital to complete the exit from its current Chapter 11, Subchapter 5 bankruptcy.

The Company proposes that the Existing Indebtedness be rolled up into a new convertible debt facility, with the Company selling additional notes under such facility to raise the required additional $1 million (the "<u>Convertible Loan Facility</u>" and the notes issued under such facility, the "<u>Notes</u>").

Each stockholders of the Company shall be offered the opportunity to purchase their pro rata share (based on existing stockholdings of the Company) of the aggregate amount of $3.7 million of Notes issuable under the Convertible Loan Facility, subject to maximum aggregate participation limits set by the Board.

At the closing of the offering to existing stockholders described above, all Existing Indebtedness would be exchanged, on a dollar-for-dollar basis, for new Notes (provided that interest on such Notes would be calculated on the basis on the date the Existing Indebtedness was originally issued).

**Principal Terms of Convertible Loan Facility:**

| | |
|---|---|
| **Conversion:** | In the event that the Company consummates an equity financing during such time as the Notes are outstanding (an "<u>Equity Financing</u>"), all principal, interest and fees due under the Notes shall automatically convert into the securities sold in the Equity Financing at the lower of (i) the price per share at which shares are sold in the Equity Financing and (ii) the price per share derived by a fully-diluted, pre-money valuation (including the New Equity |

**CONFIDENTIAL**

Pool (as defined below)) of [$1.5] / [$1.2] million.

Upon or prior to any such conversion, the Company shall create an equity incentive pool equal to [25%] / [22.5%] of the post-conversion capitalization of the Company (the "New Equity Pool"), to be granted by the Company's Board of Directors to the Company's management team and otherwise use to satisfy the Company's existing equity issuance obligations. Such [25%] / [22.5%] shall be calculated post the conversion of the Notes, but prior to the issuance of any shares in the Equity Financing.

In the event the Company does not consummate an Equity Financing within 6 months of the date on which the Company exits bankruptcy (or, in the event of a change of control of the Company prior to such time), the Noteholder Majority (as defined below) may elect to convert all principal, interest and fees due under the Notes into new series of preferred stock of the Company, with substantially the same terms as the Company's existing Series 1 and Series 2 Preferred Stock (with a senior liquidation preference, and series-specific approval rights over a sale or liquidation of the Company or authorization of additional shares), at the price per share derived by a fully-diluted, pre-money valuation (including the New Equity Pool) of [$1.5] / [$1.2] million. Following such conversion, the pro forma capitalization of the Company (assuming $3.7 million in principal amount of Notes and $300,000 in interest and fees on the Notes) shall be:

o Shares issued on conversion of Notes: [72.7%] / [76.9%]
o New Equity Pool: [25%] / [22.5%]
o Currently outstanding Common Stock, Preferred Stock, options and warrants: [2.3%] / [0.6%]

In addition, as a condition to funding the Notes, the holders of the Company's currently outstanding preferred stock will agree to prospectively waive any anti-dilution adjustment that otherwise would apply to any conversion of the Notes.

| | |
|---|---|
| **Maturity:** | The Notes will become due and payable on the date one year following the execution of the Convertible Loan Facility. |
| **Interest:** | Interest will accrue on principal at 20% per annum, based on a 365 day year, payable at maturity; provided, however, that such rate shall increase to 25% on the occurrence of an event of default (as customarily defined). |
| **Security:** | The Notes will be secured by a pledge of all of the Company's assets, on the same terms as contemplated by the Existing |

**CONFIDENTIAL**

Indebtedness (including Blue58 LLC's role as security agent).

**Representations;**
**Other Terms:**
The documentation for the Convertible Loan Facility will contain standard representations and warranties, including with respect to corporate authority, organization and related matters, and otherwise be on similar same terms as the Existing Indebtedness (including with respect to the Company's executive operating committee). Blue58 LLC shall be granted a seat on the Company's Board and an observer right.

**Noteholder Majority:**
Any actions, waivers and amendments with respect to the Notes will require the approval of a majority-in-interest of the then-outstanding Notes, which majority must include each of Blue58 LLC and Little Harbour SAZ, LLC (the "Noteholder Majority").

**Fees:**
Fees under the Convertible Note Facility shall be the same as fees under the Existing Indebtedness: 2% commitment fee, 2% funding fee and 2% fee upon exit from bankruptcy, it being agreed that a Noteholder Majority may elect to cause such amounts to be converted into equity upon any conversion of the Notes.

**CONFIDENTIAL**

**EXHIBIT E**

**Liquidation Analysis**

**Clover Fast Food, Inc.**
Liquidation Analysis
Summary Worksheet

| Assets | | Book Value (1) | Recovery % | | Recovery Amount | |
|---|---|---|---|---|---|---|
| | | | LOW | HIGH | LOW (2) | HIGH (3) |
| **Current Assets** | | | | | | |
| Cash | | $ - | 0% | 0% | $ - | $ - |
| Accounts Receivable | | $27,588 | 59% | 94% | $16,207 | $25,804 |
| Inventory | (4) | 133,606 | 10% | 20% | 13,361 | 26,721 |
| Prepaid Expenses | | 192,093 | 10% | 25% | 19,209 | 48,023 |
| Beer/Wine License | | 150,000 | 75% | 100% | 112,500 | 150,000 |
| **Total Current Assets** | | **$503,287** | **32%** | **50%** | **$161,277** | **$250,549** |
| **Fixed and Other Assets** | (9) (11) | | | | | |
| Leasehold Improvements | | $10,372,680 | 0% | 0% | $ - | $ - |
| FFE | | 560,269 | 5% | 15% | 28,013 | 84,040 |
| Kitchen Equipment | | 2,119,642 | 5% | 15% | 105,982 | 317,946 |
| Auto/Truck | (10) | 1,298,370 | 0% | 10% | - | 129,837 |
| Computers and Electronic Equipment | | 371,619 | 0% | 10% | - | 37,162 |
| POS | | 1,308,045 | 0% | 10% | - | 130,805 |
| Deposits | | 63,344 | 10% | 25% | 6,334 | 15,836 |
| **Total Fixed & Other Assets** | | **$16,093,969** | **1%** | **4%** | **$140,330** | **$715,626** |
| **Total Assets** | | **$16,597,256** | | | **$301,607** | **$966,175** |
| Liquidation Fees, Expenses and Wind Down Costs | (5) | | 150% | 68% | $453,748 | $659,675 |
| **Estimated Proceeds Available For Secured Debt Distribution** | | | | | **$(152,141)** | **$306,500** |

| Liabilities | | Book Value | Recovery % | | Recovery Amount | |
|---|---|---|---|---|---|---|
| | | | LOW | HIGH | LOW | HIGH |
| **Less Secured Debts** | | | | | | |
| Tranche A | (6) | $850,000 | -18% | 36% | $(152,141) | $306,500 |
| Tranche B | (7) | 1,885,670 | 0% | 0% | - | - |
| Tranche C | (8) | 316,267 | 0% | 0% | - | - |
| **Total Secured Debt** | | **3,051,937** | **-5%** | **10%** | **$(152,141)** | **$306,500** |
| **Estimated Proceeds Available For Unsecured Debt Distribution** | | | **0%** | **0%** | **$ -** | **$ -** |
| **Total Unsecured Debt** | (8) | **3,832,012** | **0%** | **0%** | **$ -** | **$ -** |
| **Est. Overage/(Shortfall) after all distributions** | | | **-184%** | **-172%** | **$(7,036,090)** | **$(6,577,450)** |

**Notes:**

(1) Book Value based on 12/31/2023 balance sheet

(2) A Low Recovery situation for this client would be considered a "Forced Liquidation" where doors would be closed on Day 1 and the collection of AR and sales of assets would occur

(3) A High Recovery situation for this client would be considered an "Orderly Liquidation" where Newpoint would assist the client in a 3-month winddown procedure where we would continue limited operations for additional invoicing and collections and the company would likely be put in a buyout situation where Newpoint would assist in the sales of the various business lines to either one or several buyers

(4) Inventory consists of raw materials, finished goods, goods in transit, and other inventories

(5) Liquidation Fees, Expenses, and Wind Down Cost are calculated based on a 13-week wind down period

(6) Tranche A debt consists of post-petition secured promissory notes

(7) Tranche B debt consists of pre-petition secured promissory notes

(8) Tranche C debt consists of accrued payroll, and various payroll-related and other taxes

(8) Unsecured Debt consists primarily of trade accounts payable, gift cards, and accrued expenses

(9) Fixed Asset liquidation values were determined with help from Company management, and approximate depreciated book value. Forced liquidation values are assumed to be 30 percent lower than those obtained in an orderly liquidation.

(10) Auto/Truck assumes a low scenario where there is no equity remaining after application to outstanding liens, and a high scenario where there is 10% of the book value remaining after application to outstanding liens

(11) Fixed assets are recorded at undepreciated book value

**EXHIBIT F**

**Projections**

275709514

**Clover Fast Food, Inc.**
Cash Flow Launcher™
Key Schedule

NEWPOINT ADVISORS CORPORATION
*Showing small distressed companies the way forward*

| Sales and Collections | Q1 2024 1/1 3/31 Projected | Q2 2024 4/1 6/30 Projected | Q3 2024 7/1 9/29 Projected | Q4 2024 9/30 12/29 Projected | 2025 12/30/2024 12/31/2025 Projected | 2026 1/1/2026 12/31/2026 Projected | 2027 1/1/2027 12/31/2027 Projected | 2028 1/1/2028 12/31/2028 Projected [1] |
|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | |
| Total Sales | $3,579,552 | $4,541,461 | $4,888,752 | $5,174,454 | $19,414,410 | $20,275,050 | $20,883,301 | $21,509,800 |
| **Operating Collections** | | | | | | | | |
| Existing Accounts Receivable Collections | $3,489,259 | $4,541,461 | $4,888,752 | $5,174,454 | $19,414,410 | $20,275,050 | $20,883,301 | $21,509,800 |
| Total Operating Collections | $3,489,259 | $4,541,461 | $4,888,752 | $5,174,454 | $19,414,410 | $20,275,050 | $20,883,301 | $21,509,800 |
| **Non-Operating Collections** | | | | | | | | |
| Other Non-Operating Collections | 1,140,164 | 1,060,000 | 60,000 | 60,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| Total Non-Operating Collections | $1,140,164 | $1,060,000 | $60,000 | $60,000 | $240,000 | $240,000 | $240,000 | $240,000 |
| **Total Collections** | $4,629,423 | $5,601,461 | $4,948,752 | $5,234,454 | $19,654,410 | $20,515,050 | $21,123,301 | $21,749,800 |
| **Cumulative Collections** | $4,629,423 | $10,230,883 | $15,179,635 | $20,414,089 | $40,068,499 | $60,583,549 | $81,706,850 | $103,456,650 |

| Purchases and Disbursements | Q1 2024 1/1 3/31 Projected | Q2 2024 4/1 6/30 Projected | Q3 2024 7/1 9/29 Projected | Q4 2024 9/30 12/29 Projected | 2025 12/30/2024 12/31/2025 Projected | 2026 1/1/2026 12/31/2026 Projected | 2027 1/1/2027 12/31/2027 Projected | 2028 1/1/2028 12/31/2028 Projected |
|---|---|---|---|---|---|---|---|---|
| **Operating Disbursements** | | | | | | | | |
| Utilities | $160,457 | $179,698 | $179,698 | $179,698 | $718,791 | $718,791 | $718,791 | $718,791 |
| Cost of Goods Sold | 836,297 | 997,759 | 1,074,059 | 1,136,380 | 4,255,639 | 4,444,291 | 4,577,620 | 4,714,948 |
| Packaging | 166,460 | 173,030 | 186,261 | 197,147 | 720,275 | 752,204 | 774,770 | 798,014 |
| Delivery Costs | 55,208 | 68,122 | 73,331 | 77,617 | 291,216 | 304,126 | 313,250 | 322,647 |
| Maintenance & Repair | 39,304 | 52,389 | 56,395 | 59,691 | 223,959 | 233,887 | 240,903 | 248,130 |
| Insurance | 154,013 | 162,695 | 162,695 | 162,695 | 650,778 | 650,778 | 650,778 | 650,778 |
| Professional Fees | 283,260 | 209,000 | 9,000 | 9,000 | 36,000 | 36,000 | 36,000 | 36,000 |
| Other Operating Disbursements | 489,493 | 544,380 | 544,380 | 544,380 | 2,208,658 | 2,208,658 | 2,208,658 | 2,208,658 |
| Payroll and Payroll Expenses | 2,233,875 | 1,924,665 | 2,353,688 | 2,520,463 | 9,116,839 | 9,393,758 | 9,589,469 | 9,791,052 |
| Occupancy Costs | 487,396 | 410,781 | 418,715 | 432,349 | 1,505,945 | 1,505,945 | 1,505,945 | 1,505,945 |
| Total Operating Disbursements | $4,905,763 | $15,100,158 | $5,058,222 | $5,319,418 | $19,728,099 | $20,248,438 | $20,616,184 | $20,994,963 |
| **Non-Operating Disbursements** | | | | | | | | |
| Term Debt, Fees, Interest, etc. | $82,903 | $78,798 | $78,798 | $78,798 | $315,191 | $315,191 | $315,191 | $315,191 |
| Payment Unsecured Creditor Pool | | 250,000 | | | | | | |
| Capital Expenditures | 10,000 | 15,000 | 15,000 | 15,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| Total Non-Operating Disbursements | $92,903 | $343,798 | $93,798 | $93,798 | $375,191 | $375,191 | $375,191 | $375,191 |
| **Total Disbursements** | $4,998,667 | $5,066,315 | $5,152,020 | $5,413,216 | $20,103,290 | $20,623,629 | $20,991,375 | $21,370,154 |
| **Cumulative Disbursements** | $327,703,960 | $398,647,465 | $459,926,738 | $530,537,689 | $63,507,271 | $84,130,901 | $105,122,276 | $126,492,430 |
| **Net Cash Flow** | ($369,244) | $535,145 | ($203,268) | ($178,763) | ($448,880) | ($108,580) | $131,926 | $379,646 |

[1] Other Non-Operating Collections includes $1.9M investor funding, $20k monthly Harvard inflow, $150k liquor license sale, $20k sale of 3 food trucks

**<u>EXHIBIT G</u>**

**HSQ Amendment**

275709514

THIRD AMENDMENT TO LEASE

This Third Amendment to Lease (the "**Third Amendment**") is entered into as of March __, 2024 between President and Fellows of Harvard College, a Massachusetts charitable and educational corporation ("**Landlord**") and Clover Fast Food, Inc., a Delaware corporation ("**Tenant**").

RECITALS

Landlord and Tenant are parties to a Lease dated as of January 1, 2016, as amended by a First Amendment to Lease dated July 31, 2016, as further amended by Second Amendment to Lease January 21, 2021 as further amended by a letter agreement dated June 30, 2020 (as so amended, the "**Original Lease**") of certain premises described therein at 1326 Massachusetts Avenue, Cambridge, Massachusetts. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Original Lease.

WHEREAS, on November 3, 2023 ("**Petition Date**"), Tenant filed a case under Chapter 11, Subchapter V, of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., in the United States Bankruptcy Court, District of Delaware (the "**Bankruptcy Court**"), which case is proceeding as *In re Clover Fast Food, Inc.*, Case No. 23-11812-BLS (the "**Bankruptcy Case**");

WHEREAS, Tenant filed with the Bankruptcy Court a *Chapter 11 Plan of Reorganization* [DKT 153], which is referred to herein as the "**Reorganization Plan**."

WHEREAS, Tenant intends to file that certain *Modified Chapter 11 Plan of Reorganization* (the "**Modified Plan**");

WHEREAS, Landlord and Tenant have agreed that as part of the Modified Plan to assume the Lease and amend it as provided in this Third Amendment.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.    Recitals.   The Recitals are accurate and incorporated herein by reference.

2.    Pre-Petition Date Rent.  The parties agree that the outstanding Rent due Landlord before the Petition Date is $12,555.17 which will be due and paid in full on the Effective Date as that term is defined in the Modified Plan.

3.    Post-Petition Rent.  The parties agree that the Rent due from and after the Petition Date has been paid in full through March 31, 2024.

4.    Basic Rent.  The parties agree that commencing September 1, 2023 and continuing for the period ending February 28, 2025, the Monthly Basic Rent is and will be an amount equal to eight percent (8%) of Gross Revenue (as defined in Section 3.5.1 of the Original Lease) for the applicable month, payable in arrears on or before the 10th of the following month. Within ten (10) days after the end of each month during such period, Tenant shall furnish to Landlord a statement of Gross Revenue for such month certified by the officer of the corporation

and any failure to timely submit such statement shall be treated as a failure to submit an Annual Statement under Section 3.5.4(b) of the Original Lease.

All other Rent, including but not limited to charges for Operating Expenses and Taxes, shall be payable as set forth in the Original Lease.

5.    <u>Hours of Operation</u>.  Section 5.1.4 shall be amended by the addition of the following sentence at the end of such Section:

Tenant shall not permit music to be played within or permit other objectionable noise to be emitted from the Premises after 9:30 p.m. Boston time.

6.    <u>Entire Agreement</u>.  The Original Lease, as modified by this Third Amendment, contains the entire agreement by and between Landlord and Tenant with respect to the Premises. This Third Amendment shall be binding and inure to the benefit of the successors and assigns of Landlord and Tenant, subject to the provisions of the Original Lease limiting assignment or other transfers of Tenant's rights under the Lease. The Original Lease, as modified by this Third Amendment, merges and supersedes all prior agreements and understandings between the parties concerning the subject matter hereof, and constitutes the final and complete agreement and understanding between the parties. There are no oral statements or oral agreements modifying or otherwise affecting the subject matter of the Original Lease as amended by this Third Amendment.

7.    <u>Governing Law</u>.  The Original Lease, this Third Amendment, and the rights and obligations of both parties thereunder and hereunder shall be governed by the laws of The Commonwealth of Massachusetts.

8.    <u>Counterparts</u>.  This Third Amendment may be executed in multiple counterparts, each of which shall constitute an original hereof, but all of which, when taken together, shall constitute but one and the same document. Delivery by a party hereto of a facsimile or portable document format (.pdf) copy of this Third Amendment executed by such party, or the execution and delivery of this Third Amendment by a party hereto via DocuSign, Sertifi or some other digital signature platform, shall constitute execution and delivery by such party of an original hereof.

9.    <u>Ratification</u>.  All of the covenants, terms, and conditions in the Original Lease as hereby modified by this Third Amendment, shall remain and continue in full force and effect. The Original Lease as hereby amended is expressly ratified and confirmed by Landlord and Tenant.

10.    <u>No Broker</u>.  Landlord and Tenant warrant to each other that neither has dealt with any broker in connection with this Third Amendment.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment to take effect as an instrument under seal as of the date first set forth above.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE

By: _____

Name:_____
Title:_____
Duly Authorized

By: _____

Name:_____
Title:_____
Duly Authorized

CLOVER FAST FOOD, INC.

By: _____

Name:_____
Title:_____
Duly Authorized